1  STEPHEN R. JAFFE (SBN 49539)
   The Jaffe Law Firm
2  1 Sansome Street, Suite 3500
   San Francisco, CA 94104
3  415-618-0100
   stephen.r.jaffe@jaffetriallaw.com
4  Attorneys for Petitioner JOHN C. VERNILE

5              UNITED STATES DISTRICT COURT

6              CENTRAL DISTRICT OF CALIFORNIA

7  **JOHN C. VERNILE,**                    )   CASE NO. _____
                                           )
8              Petitioner,                 )   **PETITION FOR CONFIRMATION OF**
                                           )   **ARBITRATION AWARD**
9      vs.                                 )   [9 U.S.C. §13]
                                           )
10 **PACIFICA FOUNDATION, INC.,** a        )
   California nonprofit corporation,       )
11                                         )
              Defendant.                   )
12
13     Petitioner, John C. Vernile, states:

14     1. Petitioner is a resident and citizen of the State of New York;

15     2. Defendant PACIFICA FOUNDATION, INC., ("PACIFICA") is a corporation

16        organized and existing under the laws of the State of California.  PACIFICA is a

17        nonprofit corporation recognized as tax exempt under Section 501(c)(3) of the

18        Internal Revenue Code and Section 23701(d) of the California Revenue and Taxation

19        Code.

20     3. Jurisdiction of this court is proper under 9 U.S.C. §13 and 28 U.S.C. §1338.

21     4. Venue in this court is proper because PACIFICA maintains its principal place of

22        business at 3729 Cahuenga Blvd. West, Los Angeles, California 91604.

23     5. The amount in controversy in this action is in excess of $75,000.

24     6. On July 22, 2019, plaintiff and PACIFICA entered into a written contract of

25        employment ("contract") whereby plaintiff was employed by PACIFICA as its

26        Interim Executive Director.  A true and correct copy of the contract is appended to

27        this complaint as Exhibit A hereto.

28

7.   Paragraph 13 of the contract states as follows:

**Arbitration:** In the unlikely event of a dispute between Pacifica and the Employee arising out of Employee employment or the termination of employment: Pacifica and Employee agree to submit our dispute to final and binding arbitration with the American Arbitration Association (AAA) or similar provider. Employer and Employee will select a mutually agreeable arbitrator. The arbitration will be held in accordance with AAA's then applicable rules for the resolution of employment disputes, as the exclusive remedy for such controversy, claim or dispute, unless another forum or Arbitrator or Association is agreed to by both parties. A copy of the current AAA employment arbitration rules is available at https://www.adr.org/. Except as otherwise required by law or AAA's rules, Employee and Pacifica will share equally the administrative cost and arbitrator's fees for that arbitration.

By agreeing to arbitration, Employee and Pacifica are agreeing that there will be no court or jury trial of disputes between parties concerning Employee's employment or the termination of Employee employment. The arbitrator will have the discretion to award to the prevailing party reasonable cost and attorney fees incurred in either bringing or defending an action under this agreement, if such cost or fees would be available under the law giving rise to the claim(s) arbitrated. This agreement to arbitrate is intended to be broad (and covers, for example, claims under state and federal laws prohibiting discrimination on the basis of race, sex, age and disability, family, leave, etc. under Title Vfl of the Civil Rights Act, the California Fair Employment and Housing Act, the American with Disabilities Act, the Employment Retirement income Security Act, the Fair Labor Standards Act, and the California Labor Code), and the claims excluded from final and binding arbitration shall be claims that you may have from worker compensation or unemployment benefits. In addition. Pacifica and Employee agree that Pacifica and Employee shall have the right to seek judicial relief in the form of injunctive and/or other equitable relief under the California Arbitration Act, Code of Civil Procedure section 1281.8."

8.   On November 16, 2019 and again on November 21, 2019, Pacifica involuntarily terminated the employment of the Petitioner in writing .

9.   On or about May 15, 2020, and pursuant to the foregoing Paragraph 13 of the contract, Petitioner initiated an arbitration proceeding, Case No. 01-20-0005-2636, before the American Arbitration Asssociation ("arbitration") seeking damages for unlawful employer retaliation and wrongful termination under California Labor Code §1102.5 *et. seq.* and other claims arising out of

2

his employment by Pacifica.  In response, Pacifica counterclaimed against Petitioner for economic damages.

10. On August 26, 2020, Dana Welsh, Esquire was selected and appointed as Arbitrator in the arbitration.  A true and correct copy of the Arbitrator's appointment is attached hereto as Exhibit B.

11. April 18, 2022, following pre-hearing and post-hearing briefing by the parties and evidentiary hearings on December 13, 14, 15, 16 and 17, 2021, and January 12 and January 25, 2022, the Arbitrator rendered a Final Award ("Award") in the arbitration proceeding, a true and correct copy of which is attached hereto as Exhibit C.

12. Exhibit The Award provides for an arbitration award of three hundred thousand dollars ($300,000) in favor of the Petitioner and denies all relief to Pacifica.

13. There have been no previous petitions or requests of any court or tribunal to confirm the Award.

WHEREFORE, Petition requests this court:

A. Confirm the Award of of three hundred thousand dollars ($300,000) in favor of the Petitioner;

B. Confirm the Award denying Pacifica any relief; and

C. Issue a judgment forthwith in favor of John C. Vernile and against Pacifica Foundation, Inc. in the sum of three hundred thousand dollars ($300,000).

Dated: April 19. 2022

The Jaffe Law Firm

By: _____

Stephen R. Jaffe, Attorneys for
Petitioner, John C. Vernile

EXHIBIT   A

# CONFIDENTIAL

### Draft Interim ED Employment Agreement

## EMPLOYMENT AGREEMENT

This Employment Agreement is entered into as of the date of the last signature affixed hereto, by and between the Pacifica Foundation ("Pacifica" or "Employer"), and John Vernile, ("Employee" or Vernile).

In consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Pacifica and Employee hereby agree as follows:

1. **Position of Employment:** Pacifica will employ the Employee in the position of interim Executive Director of Pacifica (ED) and, in that position, Employee will report to the Pacifica National Board (PNB) but will have the authority of the chief executive of the Foundation. Employee will be supported by, and will work with, a transition team during at least the first three months of employment, with such transition team consisting of the officers of the Pacifica National Board. Pacifica retains the right to change Employee's duties, as may be determined to be in the best interests of the Employer. This position is a full time, exempt, non-union position with supervisory and managerial responsibilities.

   The terms and conditions of the Employee's employment shall, to the extent not addressed or described in this Employment Agreement, be governed by Pacifica's Employee Handbook and existing practices. In the event of a conflict between this Employment Agreement and the Pacifica Employee Handbook or existing practices, the terms of this Agreement shall govern.

   This offer is subject to successful completion of a background check using Pacifica's usual procedures and vendors.

2. **Term of Employment:** Employee's term of employment under this Agreement shall commence on or about August 1, 2019 and shall continue thereafter for an initial term of six months (the "Initial Term"), with any renewal and/or future terms of employment at the sole discretion of the PNB.

   Employee Compensation and Benefits.

   a. Salary. Employee shall be paid a Salary of $120,000 annually, subject to applicable federal, state, and local withholding, such Salary to be paid to Employee in the same manner and on the same payroll schedule in which all Pacifica employees receive payment. Any increases in Employee's Salary for periods beyond the first six months of Employee's employment shall be in the sole discretion of the Pacifica National Board, and nothing herein shall be deemed to require any such increase.

   b. Employee Benefits. Employee shall be entitled to receive or participate in such benefits as are generally provided by Employer to its other employees, as determined or as modified by Employer from time to time, and for which Employee is eligible under the terms of the applicable benefit plans.
   As an employee of the Pacifica Foundation, the following benefits are available to you:

   * Medical          (I st day of the month after 30 days of employment)

   * Dental           (I st day of the month after 30 days of employment)

   * Vision           (I st day of the month after 30 days of employment)

   * Life Insurance   (Jst day of the month after 30 days of employment)

# CONFIDENTIAL

*\* Accidental Death & Disability (1st day of the month after 30 days of employment)*

*\* Retirement benefits      (eligible after 30th day of employment)*

*\* Vacation accrual will begin on the first day of the month after you begin employment (monthly vacation is accrued at 0.83 days per month) For the first year of employment only, you will be entitled to take vacation prior to your accrual, for a maximum of 5 days. This vacation will be adjusted against your accrual days as and when available.*

*\* Sick Leave is accrued at one day per month and will be forfeited at year's end if sick leave is not used.*

The 30 day waiting periods noted above come from Pacifia's insurance companies but Employer will attempt to get them waived. If this is not possible, Employer agrees to reimburse Employee for premiums paid by Employee for insurance of the same types noted above during that 30 day period.

3. **Duties and Performance:** Employee will devote the vast majority of his productive time, attention, skill, and energy exclusively to the business of Employer, and will use Employee's best efforts to promote the success of Employer's business. Employee shall pe1form the customary duties of the offices of Executive Director of Pacifica, and shall perform such other duties as may from time to time be requested of him by the PNB. Employee shall not engage in any other business activities, duties, or pursuits whatsoever, or directly or indirectly render any services of a business, commercial, or professional nature to any other person or organization, whether for compensation or otherwise, without the prior written approval of the PNB. The expenditure of reasonable amounts of time, for which Employee shall not be compensated by Employer, for educational, charitable or professional activities, shall not be deemed a breach of this Agreement if those activities do not interfere with the services required of Employee under this Agreement.

   a. General Duties.

      1. Employee shall render to the very best of Employee's ability, on behalf of the Employer, services to and on behalf of Pacifica, and shall undertake diligently all duties assigned to him by Pacifica.

      2. Employee shall faithfully and industriously assume and perform with skill, care, diligence and attention all responsibilities and duties connected with his employment on behalf of Pacifica.

      3. Employee shall have no authority to enter into any contracts binding upon Pacifica, or to deliberately create any obligations on the part of Pacifica, except as may be specifically authorized by the Pacifica National Board.

   b. Expectations of the Position: The Pacifica National Board expects the Executive Director to increase the total revenue, net income, membership, program quality and listenership of our stations through good management and to ensure that our Archives, National Office and Affiliate Network are maintained and functioning efficiently. The ED will monitor and ensure that all state and federal regulations are complied with and that all legal and HR matters are addressed in a timely manner. In addition it is expected the ED will visit the National Office and our Stations on a regular and as-needed basis. A job description for the Executive Director position is attached to and incorporated into this Agreement to more specifically detail the expectations of the position.

# CONFIDENTIAL

    c. Specific Duties. Specific duties of the position are set forth in the ED Position Announcement attached to and incorporated into this Agreement.

4. **Termination of Employment:** Employee's employment with Pacifica may be terminated, prior to the expiration of the term of this Employment Agreement, in accordance with any of the following provisions:

    a. Termination by Employee. The Employee may terminate his employment at any time during the course of this agreement by giving 90 days' notice in writing to the Chair of the PNB. During the notice period, Employee must fulfill all his duties and responsibilities set forth above and use his best efforts to train and support his replacement, if any. Failure to comply with this requirement may result in Termination for Cause described below, but otherwise Employee's salary and benefits will remain unchanged during the notification period.

    b. Termination Other than for Cause. Pacifica may terminate Employee's employment at any time during the course of this agreement by giving 90 days' notice in writing to the Employee. During the notice period, Employee must fulfill all of Employee's duties and responsibilities set forth above and use Employee's best efforts to train and suppo,t Employee's replacement, if any. Failure of Employee to comply with this requirement may result in Termination for Cause described below, but otherwise Employee's salary and benefits will remain unchanged during the notification period. Pacifica, may, in its sole discretion, give Employee severance pay in the amount of the remaining notice period in lieu of actual employment, and nothing herein shall require Pacifica to maintain employee in active employment for the duration of the notice period.

    c. Termination for Cause. Pacifica may, at any time and without notice, terminate the Employee for "cause". Termination by Pacifica of the Employee for "cause" shall include but not be limited to termination based on any of the following grounds: (a) failure to perform the duties of the Employee's position in a satisfactory manner; (b) fraud, misappropriation,embezzlement or acts of similar dishonesty; (c) conviction of a felony involving moral turpitude; (d) illegal use or being under the influence of drugs or alcohol in the workplace; (e) intentional and willful misconduct that may subject Pacifica to criminal or civil liability; (f) breach of the Employee's duty of loyalty, including the diversion or usurpation of opportunities properly belonging to Pacifica; (g) willful disregard of Pacifica policies and procedures; (h) breach of any of the material terms of this Agreement; and (i) insubordination or deliberate refusal to follow the instructions of the PNB. (For the purposes of termination for cause, Employee shall be relieved of his duties and shall vacate Employer's premises on the date of the receipt of the notification of Tennination for Cause).

    d. Retirement. The close of business on the date of Employee's retirement from employment with Employer.

(For the purpose of Non-renewal or, Termination Other than for Cause, Employer, in its sole discretion, shall determine whether Employee shall be relieved of his duties and shall vacate his office and Employer's premises on the date of the receipt of the notice required by such clauses or if Employer shall remain in the active employment of Employer during such period between the receipt of notice and the effective date of termination of employment.)

This agreement shall be considered to be a "rolling agreement" with notice, and will automatically continue following the initial six month term unless Employee or Employer gives 90 days notice, as

# CONFIDENTIAL

provided above, in which case the agreement will terminate after the 90 day notice period, unless Employee and Employer both agree on a new agreement.

5. **Compensation and benefits payable upon termination other than for cause.**

   a) <u>Salary</u>. If Employee's employment is terminated under circumstances that constitute a Termination Other Than for Cause, while this Agreement is in effect, Employee shall receive his regular Salary then in effect, less all required withholdings, through his last day of employment with Employer.

   b) <u>Severance Pay</u>. If Employee's employment is terminated under circumstances that constitute a Termination Other Than for Cause, Employee is entitled to receive Severance Pay subject to the following terms and conditions:

   i.   If Employee's employment is terminated under circumstances that constitute a Termination Other Than for Cause, Employee shall receive his monthly salary on each regular Employer pay period for the lesser of three (3) months (the "Severance Period") after the date of termination, or the then current contract term.

   ii.   Severance payments shall be at the same rate as Employee's Salary on the date of termination, and such Salary will not be further adjusted.

   iii.   The monthly amounts payable to Employee pursuant to Section 5b shall be reduced by the amount, if any, of monthly payments Employee receives during the Severance Period from any other employer or pursuant to any agreement whereby he acts as an independent contractor.

   iv.   During the Severance Period, Employee shall cease to be considered an employee of Employer under the terms of applicable fringe benefits plans and entitled only to those benefits applicable pursuant to the terms and conditions of each plan or program.

6. **Compensation and benefits payable upon resignation, termination for cause or retirement:** In the event that Employee's employment with Employer ends due to Resignation, Termination For Cause, or Retirement, then Employee shall not be paid Severance. Employee shall cease to be considered an employee of Employer under the terms of applicable fringe benefits plans and entitled only to those benefits applicable pursuant to the terms and conditions of each plan or program.

7. **Obligations Upon Termination:** In the event of te1mination (voluntary or otherwise) of Employee's employment with Employer, Employee agrees, promptly and without request. to deliver to Employer all documents and data pertaining to his employment and the Confidential Information of Employer or Customers, whether prepared by Employee or otherwise coming into his possession or control. Employee will not retain any written or other tangible material containing any information concerning or disclosing any of the Confidential Information of Employer or Customers, including, but not limited to, materials that are printed, type-written, handwritten, or magnetic tape or disk or photographic records, in photographs or negatives, or in any other form. Employee recognizes that such unauthorized taking of Employer's trade secrets could result in civil liability under California's Uniform Trade Secrets Act (Civil Code §§3426-3426.11), and that willful misappropriation may result in an award against Employee for triple the amount of Employer's damages and Employer's attorneys' fees in

# CONFIDENTIAL

collecting such damages.

Employee also agrees that in the event of termination (voluntary or otherwise) of Employee's employment with Employer, Employee will protect the value of the Confidential Information and inventions of Employer and Customers and will prevent their misappropriation or disclosure. Employee will not disclose or use to his benefit (or the benefit of any third party) or to the detriment of Employer or its Customers any Confidential Information. Employee further agrees that for a period of one year immediately following termination (voluntary or otherwise) of Employee's employment with Employer, Employee shall not interfere with the business of Employer by inducing any employee, consultant, vendor, Customer or other entity or individual to sever its relationship with Employer. Employee acknowledges that such inducement would necessarily require the use of Employer's Confidential Information in violation of this Agreement.

8. **Injunctive Relief:** Because Employee's breach of this Agreement may cause Employer irreparable harm for which money is inadequate compensation, Employee agrees that Employer will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

9. **Confidentiality during employment:** Employee agrees that at all times during Employee's employment and following the conclusion of Employee's employment, whether voluntary or involuntary, Employee will hold in strictest confidence and not disclose Confidential Information (as defined below) to anyone who is not also an employee of Pacifica or to any employee of Pacifica who does not also have access to such Confidential Information, without express written authorization of the PNB.

   a. "Confidential Information" shall mean any trade secrets or Pacifica proprietary information, including but not limited to processes, customer lists, research projects, operating methods, cost, pricing, financial data, business plans and proposals, data and information Pacifica receives in confidence from any other party, or any other secret or confidential matters of Pacifica. Additionally, Employee will not use any Confidential Information for Employee's own benefit or to the detriment of Pacifica during Employee's employment or thereafter. Employee also certifies that employment with Pacifica does not and will not breach any agreement or duty that Employee has to anyone concerning confidential information belonging to others.

   b. "Immunity from Liability for Confidential Disclosure of a Trade Secret to the Government or in a Court Filing:
   (1) Immunity-An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that-(A) is made-(i) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. (2) Use of Trade Secret Information in Anti-Retaliation Lawsuit-An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual-(A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order."

10. **Expenses:** Pacifica shall pay or reimburse Employee for any expenses reasonably incurred in furtherance of his duties hereunder, including expenses for travel, meals and hotel accommodations.

# CONFIDENTIAL

upon submission of vouchers or receipts maintained and provided to Pacifica in compliance with such rules and policies relating thereto as the organization may from time to time adopt.

11.     **Prior Commitments:**  Employee has no other agreements, relationships, or commitments to any other person or entity that conflict with Employee's obligations to Employer under this Agreement.  Employee will not disclose to Employer, or use, or induce Employer to use, any proprietary information or trade secrets of others.  Employee represents and warrants that he has returned all property and confidential information belonging to all prior employers.

12.     **Indemnification:** In accordance with the Pacifica Bylaws (Article Nine, Section 7), the Executive Director (or interim Executive Director) is an Officer of the Foundation. As such, the interim Executive Director is covered by the indemnification provisions of Article Eleven of those Bylaws, which covers indemnification of Officers. More specifically, Employer will indemnify Employee for legal expenses and awards resulting from any litigation against the Employer, its stations, and/or Employee, except for cases of intentional misconduct by Employee.

13.     **Arbitration:** In the unlikely event of a dispute between Pacifica and the Employee arising out of Employee employment or the termination of employment: Pacifica and Employee agree to submit our dispute to final and binding arbitration with the American Arbitration Association (AAA) or similar provider. Employer and Employee will select a mutually agreeable arbitrator. The arbitration will be held in accordance with AAA's then applicable rules for the resolution of employment disputes, as the exclusive remedy for such controversy, claim or dispute, unless another forum or Arbitrator or Association is agreed to by both parties. A copy of the current AAA employment arbitration rules is available at https://www.adr.org/. Except as otherwise required by law or AAA's rules, Employee and Pacifica will share equally the administrative cost and arbitrator's fees for that arbitration.

By agreeing to arbitration, Employee and Pacifica are agreeing that there will be no court or jury trial of disputes between parties concerning Employee's employment or the termination of Employee employment. The arbitrator will have the discretion to award to the prevailing party reasonable cost and attorney fees incurred in either bringing or defending an action under this agreement, if such cost or fees would be available under the law giving rise to the claim(s) arbitrated. This agreement to arbitrate is intended to be broad (and covers, for example, claims under state and federal laws prohibiting discrimination on the basis of race, sex, age and disability, family, leave, etc. under Title Vfl of the Civil Rights Act, the California Fair Employment and Housing Act, the American with Disabilities Act, the Employment Retirement income Security Act, the Fair Labor Standards Act, and the California Labor Code), and the claims excluded from final and binding arbitration shall be claims that you may have from worker compensation or unemployment benefits. In addition. Pacifica and Employee agree that Pacifica and Employee shall have the right to seek judicial relief in the form of injunctive and/or other equitable relief under the California Arbitration Act, Code of Civil Procedure section 1281.8.

13.     **General Provisions:**

   a.  Notices. All notices and other communications required or permitted by this Agreement to be delivered by Pacifica or Employee to the other party shall be delivered in writing to the address shown below, either personally, by electronic means (ed@pacifica.org), or by registered, certified or express mail, return receipt requested, postage prepaid, to the address for such party specified below or to such other address as the party may from time to time advi_se the other party, and shall be deemed given and received as of actual personal delivery, on the first business day after the date of delivery shown on any such facsimile transmission or upon the date or actual receipt shown on any return receipt if registered, certified or express mail is used, as the

# CONFIDENTIAL

case may be.

Pacifica: 1925 .BSUJO -VUIFS ,JOH, +S. 8BZ,  #FSLFMFZ, $" 94704-1037

Employee: i3 )   ?₁₁ °  ₇IP et...-t   A.-Je.   rllf t)tow ın . ɪv˙"C]f>-,9 I

b. **Amendments and Termination; Entire Agreement.** This Agreement may not be amended or terminated except by a writing executed by all of the parties hereto. This Agreement constitutes the entire agreement of Pacifica and Employee relating to the subject matter hereof and supersedes all prior oral and written understandings and agreements relating to such subject matter.

c. **Successors and Assigns.** The rights and obligations of the parties hereunder are not assignable to another person without prior written consent.

d. **Severability; Provisions Subject to Applicable Law.** All provisions of this Agreement shall be applicable only to the extent that they do not violate any applicable law, and are intended to be limited to the extent necessary so that they will not render this Agreement invalid, illegal or unenforceable under any applicable law. If any provision of this Agreement or any application thereof shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of other provisions of this Agreement or of any other application of such provision shall in no way be affected thereby.

e. **Waiver of Rights.** No waiver by Pacifica or Employee of a right or remedy hereunder shall be deemed to be a waiver of any other right or remedy or of any subsequent right or remedy of the same kind.

f. **Definitions; Headings; and Number.** A term defined in any part of this Employment Agreement shall have the defined meaning wherever such term is used herein. The headings contained in this Agreement are for reference purposes only and shall not affect in any manner the meaning or interpretation of this Employment Agreement. Where appropriate to the context of this Agreement, use of the singular shall be deemed also to refer to the plural, and use of the plural to the singular.

g. **Counterparts.** This Agreement may be executed in separate counterparts, each of which shall be deemed an original but both of which taken together shall constitute but one and the same instrument.

h. **Governing Laws and Forum.** This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of California. The parties hereto further agree that any action brought to enforce any right or obligation under this Agreement shall be subject to the exclusive jurisdiction of the courts of the State of California.

To indicate your acceptance of this employment offer, please sign and date this letter in the space provided on this document and return a completed, signed copy to Pacifica Human Resources at hr@pacifica.org and to the address on the letterhead, by July 31, 2109. Also please scan the signed acceptance letter and e-:mail it to us at ed@pacifica.org and to payroll@pacifica.org. This offer shall remain open until that date.

# CONFIDENTIAL

IN WITNESS WHEREOF, Pacifica and Employee have executed and delivered this Agreement as of the date written below.

John Vernile

Pacifica
By: _____

Name: (SBDF "BSPO    +VMZ 220E, 2019

Title: $1BJS PG UIF 1BDJGJDB 'PVOEBUJPO /BUJPOBM #PBSE

By: _____

Name: _____

Title: _____

EXHIBIT   B



AMERICAN
ARBITRATION
ASSOCIATION®

INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

Western Case Management Center
Patrick Tatum
Vice President
45 E River Park Place West, Suite 308
Fresno, CA 93720
Telephone: (877)528-0880
Fax: (855)433-3046

August 26, 2020

**VIA ELECTRONIC MAIL**

Arthur Lazear, Esq.
Lazear Mack. LLP
436-14th Street
Suite 1117
Oakland, CA 94612

Lydia Brazon, Esq.
Arthur Schwartz
Advocates for Justice
225 Broadway
Suite 1902
New York, NY 10007

**Case Number: 01-20-0005-2636**
**John Vernile**
**-vs-**
**Pacifica Foundation**

Dear Parties:

From the arbitrator list submitted, the AAA has appointed Dana Welch, Esq., who has accepted the appointment and has agreed to serve at the rate of $550/Hour, as established on the biographical data.

In accordance with the California Arbitration Law (CCP §1281.85 et seq.), enclosed please find the duly executed Notice of Appointment and Notice of Compensation Arrangements, which includes the Arbitrator Disclosure Worksheet submitted by Dana Welch, Esq., for your review.

Pursuant to §1281.91, any party may serve a notice of disqualification on the basis of the disclosure statement within fifteen (15) calendar days from the date of this letter. Absent our receipt of a notice of disqualification within the time specified, the appointment of the Dana Welch, Esq., is confirmed, as indicated by the signed oath of arbitrator contained on the Notice of Appointment.

As requested by the neutral, if either party or their counsel knows of any contact or conflict that may be relevant, they are to communicate this information to the AAA within ten (10) days.

Please call should you have any questions.

Sincerely,


/s/
Daphne J Crayne
Manager of ADR Services
Direct Dial: (559)490-1914
Email: daphnecrayne@adr.org
Fax: (855)433-3046

Enclosures

cc:    Dana Welch, Esq.

EXHIBIT   C

AMERICAN ARBITRATION ASSOCIATION
EMPLOYMENT ARBITRATION TRIBUNAL

| | | |
|---|---|---|
| JOHN VERNILE, | ) | |
| | ) | |
| | ) | |
| Claimant and Counter-respondent, | ) | |
| | ) | Case No. 01-20-0005-2636 |
| v. | ) | |
| | ) | FINAL AWARD |
| PACIFICA FOUNDATION, | ) | |
| | ) | |
| | ) | |
| Respondent and Counter-claimant. | ) | |
| _____ | ) | |

I , THE UNDERSIGNED ARBITRATOR, having been designated in accordance with

the fully executed July 22, 2019 employment agreement entered into between the above-

named parties, and having been duly sworn, and having heard the proofs and allegations

of the parties via videoconference on December 13, 14, 15, 16 and 17, 2021, and January

12 and January 25, 2022, with John Vernile represented by Arthur Lazear of Lazear Mack,

LLP, and with Pacifica Foundation represented by Arthur Z. Schwartz of Advocates for

Justice Chartered Attorneys and the General Counsel of Pacifica Foundation, do hereby

render this FINAL AWARD as follows:

## I.      INTRODUCTION

This dispute arose out of Pacifica Foundation's ("Pacifica" or "Respondent")

November 14, 2019 termination of John Vernile's ("Claimant" or "Vernile") employment

as its Interim Executive Director ("iED").  After his employment termination, Vernile

brought a demand in arbitration, in which he alleged the following causes of action:

i) violation of Cal. Labor Code §1102.5; ii) wrongful termination in violation of public

policy; iii) defamation; and iv) intentional infliction of emotional distress.  Vernile

subsequently withdrew his claim for intentional infliction of emotional distress.  Vernile

seeks actual damages, attorney's fees, interest, arbitration costs, and punitive damages.

Pacifica counterclaimed, alleging breach of contract and Pacifica's Bylaws, which it

claimed were incorporated into Vernile's employment contract.  In its counterclaim,

Pacifica sought damages for i) half of the costs of this arbitration; ii) the costs of

defending Vernile's whistleblower lawsuit filed with the U.S. Department of Labor; iii)

damages based on financial losses that allegedly occurred when Vernile took WBAI's local

programming off the air during a fundraising drive; and iv) reimbursement of amounts

Vernile authorized to be paid to attorneys retained during litigation that resulted from

WBAI local programming being taken off the air.  In its closing brief, Pacifica withdrew its

claim for half of the costs of this arbitration.[1]  At the evidentiary hearing, it presented no

evidence in support of its claim for the costs of defending Vernile's whistleblower lawsuit

filed with the U.S. Department of Labor.

For the following reasons, Vernile has not met his burden of proof with respect to

his causes of action for wrongful termination in violation of Cal. Labor Code §1102.5 or in

---

[1] Pacifica withdrew its claim for reimbursement of arbitration fees "[i]n light of changes in California law."
But those "changes" in law occurred twenty-two years ago.  In 2000, the California Supreme Court held that:

> we conclude that when an employer imposes mandatory arbitration as a
> condition of employment, the arbitration agreement or arbitration process
> cannot generally require the employee to bear any type of expense that the
> employee would not be required to bear if he or she were free to bring the action
> in court.

*Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal. 4th 90, 110-111 (2000).

violation of public policy.  However, Vernile has met his burden of proof with respect to his cause of action for defamation.  Pacifica has failed to meet its burden of proof with respect to any of its causes of action.

## II.      JURISDICTION

Vernile's July 22, 2019 employment agreement (the "Agreement") provides the jurisdiction for this Tribunal.  It states, in pertinent part:

> **Arbitration:**  In the unlikely event of a dispute between Pacifica and the Employee arising out of Employee employment or the termination of employment:  Pacifica and Employee agree to submit our dispute to final and binding arbitration with the American Arbitration Association (AAA) or similar provider . . . . Except as otherwise provided by law or AAA's rules, Employee and Pacifica will share equally the administrative cost and arbitrator's fees for that arbitration.
>
> By agreeing to arbitration, Employee and Pacifica are agreeing that there will be no court or jury trial of disputes between parties concerning Employee's employment or the termination of Employee [sic] employment.  The arbitrator will have the discretion to award to the prevailing party reasonable costs and attorney fees incurred in either bringing or defending an action under this agreement, if such costs or fees would be available under the law giving rise to the claim(s) arbitrated.
>
> Agreement, ¶ 13.

## III.      THE PARTIES

Vernile served as Pacifica's iED from July 22, 2019 until the Pacifica National Board (the "PNB") terminated his employment on November 14, 2019, purportedly for cause.  Prior to his position at Pacifica, Vernile had enjoyed a long career in broadcasting management.  He has been unable to locate a job subsequent to his termination as iED of Pacifica.

Pacifica is a California non-profit corporation that operates five radio stations: KPFA (Berkeley, California), KPFK (Los Angeles, California), KPFT (Houston), WBAI (New York), and WPFW (Washington, DC).  Pacifica also manages the Public Radio Archives, which contains recordings of prior broadcasts.  Pacifica also includes affiliated radio stations.  It is governed by the PNB, to whom Vernile reported.

IV.     STATEMENT OF FACTS

A.   Pacifica hires Vernile; Pertinent Terms of the Agreement.

Pacifica hired Vernile to be its iED on July 22, 2019.  The Agreement specified that it was to be "governed by, construed, and enforced in accordance with the laws of the state of California."  Agreement, ¶ 13(h).

The Agreement specified that Pacifica would employ Vernile for "an initial term of six months (the 'Initial Term'), with any renewal and/or future terms of employment at the sole discretion of the PNB."  Agreement, ¶ 2.  The Agreement further specified that Vernile "will report to the Pacifica National Board (PNB) but will have the authority of the chief executive of the Foundation."  Agreement, ¶ 1.

The Agreement provided that for the first three months of his employment, Vernile would be supported by, and work with, a "transition team" consisting of the PNB's officers.  *Id.*  At the time Vernile was hired, the transition team consisted of Bill Crosier (PNB secretary-treasurer), Sabrina Jacobs (PNB vice-chair), and Grace Aaron (PNB chair).  In September 2019, Aaron was removed from her position as PNB chair, and thus no longer served on the transition team.

4

The Agreement provided that should either party decide to terminate Vernile's employment without cause, 90-days' notice was required.  Agreement, ¶ 4(a).  It also provided that Pacifica could terminate Vernile's for cause without any notice.  *Id.* at ¶ 4(b).  Pertinent to this dispute, the Agreement's definition of "cause" included the "failure to perform the duties of the Employee in a satisfactory manner," "willful disregard of Pacifica policies and procedures," and "insubordination or deliberate refusal to follow the instructions of the PNB."  *Id.*

The Agreement was a "rolling agreement" that would "automatically continue following the initial six month term unless Employee or Employer gives 90 days notice, as provided above, in which case the agreement will terminate after the 90 day notice period, unless Employee and Employer both agree on a new contract."  *Id.* at ¶ 4.

The Agreement, which consisted of two documents executed on the same day, listed the priorities of the iED as:

- Work out plans at all the stations to improve programming and increase listeners.

- Examine the specific needs of every station and work with management there to improve revenue and cash flow.  Development of specific plans at each station.

- Carefully track requirements for CPB funding and provide regular progress reports.  (This includes tracking audits, compliance issues, etc.)

- Keeping track of the local board elections and making sure that stations fully cooperate with the National Election Supervisor.  (After an initial visit/review of stations).

- Working with the Strategic Planning Committee on an overall recovery plan to both pay off debts and invest in the future.

- A national donor development program and the creation of a national development department.

B. <u>Legacy Issues Confronting Vernile When He Commenced Employment</u>.

Vernile encountered a number of pressing and unresolved issues when he began as iED.  These included:

<u>Compliance with the California Attorney General's Plan</u>.  In 2017, the California Attorney General threatened to revoke Pacifica's non-profit status because of certain deficiencies, including its failure to conduct and submit audits over the course of several years.  In response, Pacifica offered a plan to address those deficiencies.  Dated March 30, 2017, the Pacifica Financial Recovery and Stabilization Plan (the "Plan"), authored by Crosier (the then-iED) and Sam Agarwal (the then-CFO) was accepted by the California Attorney General.  As a result, Pacifica was able to retain its non-profit status.  Pacifica was bound by the terms of the Plan.  Among other requirements, the Plan called for Pacifica to become current in its yearly audits.  When Vernile became iEd in 2019, the 2015, 2016, 2017, and 2018 audits remained outstanding, impeding the ability of philanthropists to contribute to Pacifica.

<u>Self-inurement</u>.  As a non-profit corporation, Pacifica could not air programs in which the program host financially benefitted from products or services they were promoting.  Pacifica's mission statement also banned self-inurement.  Vernile discovered

6

that a number of program hosts promoted products from which they personally

benefitted.  As one example, a program host on WBAI named Gary Null promoted his

own cookbooks on his program.

Programming antithetical to Pacifica's Mission Statement.  Vernile also testified

that he was concerned about programming that he believed violated Pacifica's Mission

Statement, specifically, programming that promoted health and beauty products.  He

discussed his concerns with Aaron, the then-PNB chairman.  According to Vernile, Aaron

was unconcerned; she supported the promotion of health and beauty products because

they raised more money in fund drives than other pitches, for example, those focused on

the mission of Pacifica as a progressive force.  In her testimony, Aaron defended this type

of programming and disagreed that it was contrary to the Mission Statement.

Compliance issues at WBAI.  On July 31, 2019, Vernile met at WBAI with John

Almeleh, Pacifica's compliance officer, and learned of what he characterized in his

testimony as "a litany" of compliance concerns.  These concerns included FCC violations,

for example, the lack of a working telephone (required by FCC regulations), $200,000 in

equipment losses, the failure to monitor WBAI's air signal, and the lack of security in the

air studio (*i.e.*, anyone could enter it).[2]  Vernile raised these concerns on a PNB call on

August 1, 2019.  Although he could not recall the exact response, Vernile did recall the

gist, which was that WBAI was in rough shape and needed help.

---

[2] According to WBAI General Manager Berthold Reimers, Vernile spent no time with him on this visit, and
did not visit the station again until October 7, 2019, described more fully below.  Vernile lives north of
New York City so could easily have visited the station.  Vernile testified that he did not visit because he
was scared to go to WBAI.

C. Vernile Meets with NETA and Learns More About Pacifica's Financial Straits.

On August 9, 2019, Vernile met with staff from NETA in South Carolina.  NETA served as the outsourced human resources and accounting service for a number of public broadcasters, including Pacifica.  During those meetings, Vernile learned, for the first time, about numerous issues that he testified were a "shocker for him" and that had not been disclosed in PNB discussions prior to his accepting the iED position.  Most, but not all, of these issues centered on Pacifica's precarious financial position.  NETA staff members Anita Sims and Tamra Swiderski informed Vernile that WBAI caused most of Pacifica's financial difficulties.[3]  These issues included:

- A balloon payment on a loan taken out by WBAI that was coming due in April 2021.  The loan was taken out to pay an outstanding judgment for a balance due to the Empire State Building Realty Trust for past-due rent on a lease for a transmitter;[4]

- Improper backup for WBAI's cash expenditures.  WBAI used QuickBooks, which was not tied to NETA's accounting system;[5]

- WBAI's payroll system, which was out of compliance;

---

[3] There were several historical reasons for the precarious financial situation in which WBAI found itself.  It had entered into a costly contract ($69,000 monthly) with the Empire State Building for the placement of its transmitter.  A 2013 layoff of 19 employees had decimated the staff, resulting in fewer employees to conduct fund drives.

[4] WBAI moved its transmitter to 4 Times Square when negotiations with the Empire State Building Realty Trust failed.  Its monthly rent for a transmitter dropped to $12,000.

[5] Reimers testified that NETA had access to QuickBooks, which he used to pay vendors.

- WBAI's failure to comply with limits on gifts, which could jeopardize Pacifica's non-profit status;

- WBAI's failure to track gifts, which could not be tracked appropriately at a donor level, endangering Pacifica's non-profit status with the IRS.

Vernile also learned of numerous human resources issues, again, primarily centered on WBAI. These issues included:

- The misclassification of about 8-10 independent contractors who should have been classified as employees;[6]

- Cash payments for salaries;

- The failure to pay overtime; and

- The failure to pay retirees their pensions (Pacifica had been cited by the Department of Labor for its failure to account for pensions and had entered into a consent decree).

After his meeting at NETA, Vernile met with the transition team (Crosier, Jacobs, and Aaron), who acknowledged these issues, offered him encouragement, and told him that they would figure it out together. Vernile continued to meet frequently with the transition team, who provided him with guidance on addressing the multiplicity of issues that arose.

---

[6] Reimers explained that he used independent contractors because WBAI could not afford to pay regular employees.

D. <u>Vernile Meets With Foster Garvey/Attempts to Restore CPB Funding</u>.

Sometime in August 2019, Vernile met with Pacifica's FCC lawyers at Foster Garvey, a firm that had represented Pacifica in FCC matters for thirty years.  The lawyers informed Vernile of numerous FCC violations, primarily occurring at WBAI, but also at KPFT.  When Vernile told the lawyers he felt obligated to inform the PNB of these FCC issues, they warned him to refrain from doing so because the PNB was "leaky" and should the FCC learn about these issues, Pacifica stood a chance of losing its license or of failing to get it renewed.

Vernile also learned that Pacifica had lost its funding from the Corporation for Public Broadcasting (the "CPB"), which previously had granted Pacifica approximately $1 million a year.  The loss to Pacifica amounted to approximately $8 – $14 million over the years.  The CPB had stopped funding Pacifica because of various compliance issues, including the inflation of gift values used to support funding, and the lack of adequate accounting systems.  At first, the CPB did not return Vernile's calls.  Vernile learned from the transition team that Pacifica owed about $137,000 to the CPB and also needed clean audits to reestablish a relationship.

When the call finally happened on September 11, 2019, it was adversarial.  Erica Hayes, the CPB officer who led the call, told Vernile that nothing had changed since issues with Pacifica first arose in 2013, that it continually promised to "get its act together" but never did, that Pacifica would have to live by IRS and FCC requirements, and further, that all Pacifica stations would have to meet certain listener and audience thresholds, which only KPFA and WPFB met at the time.  When Vernile asked if they

could continue the conversation, Hayes responded no, not until Pacifica repaid CPB the $137,000 outstanding.

E.   Meeting in Berkeley About Union Negotiations.

On August 15, 2019, Vernile met in Berkeley with Quincy McCoy, the General Manager of KPFA, Anyel Z. Fields, the General Manager of KPFK, Aaron, and Pacifica's labor lawyer, Warren Nelson.  KPFA and KPFK were finalizing negotiations with unions that represented their staff.  Neither side anticipated any changes to the contracts at that point.  Aaron objected to the contracts, urging that they discontinue the negotiations because the PNB had passed a resolution to equalize the terms of the union contracts with employees at the five Pacifica stations.

McCoy and Fields responded that to do so would cause the staff to become demoralized, jeopardizing the impending fund drive.  Nelson and Vernile also objected; to reopen the all-but-concluded negotiations could trigger an NLRB violation of bad faith bargaining.  Vernile testified that he was obstructed when he tried to bring this issue up at a PNB meeting.  The two union contracts were finalized as originally proposed.

F.   Other Legal and Compliance Issues that Came to Vernile's Attention.

During this time, Vernile learned of numerous other issues, including, but not limited to, the lapse of the Pacifica Directors and Officers insurance policy (potentially exposing PNB members and Pacifica officers to personal liability), and WBAI's failure to meet its obligations to send paid-for premiums (gifts) to donors.

He also learned of an August 16, 2019 FBI visit to WBAI that was an attempt to obtain the recording of Randi Credico's interview with Roger Stone as part of the Mueller

11

investigation.  As recounted to Vernile, the FBI agent said he had been trying to get in touch with WBAI, but that no one answered the phone.  Reimers testified that he refused to give anything to the FBI without a subpoena, citing freedom of speech.  Further, according to Vernile, Reimers told the FBI agent that WBAI did not have the tapes, which was not true.  Vernile felt strongly that Reimers' approach was wrong, but more importantly, a potential violation of the law.

On August 31, 2019, Vernile received a call from Almeleh, who told him that Mimi Rosenberg, a long-time WBAI host, had violated FCC law and IRS regulations with respect to political programming by a non-profit.  Rosenberg had included in her show a cart (*i.e.*, a promotional spot) about dumping Trump.  Pacifica's FCC lawyers opined that Rosenberg's spot violated both FCC and IRS regulations.  Reimers disagreed that the cart violated any laws, as did Aaron.  However, the cart was cut.

A torrent of protest to this action flooded online bulletin boards and listservs. Some listeners called Vernile a Trump supporter.  Testimony about what occurred next conflicted.  Vernile testified that Rosenberg went on the air the next day (Labor Day) and violated various FCC rules pertaining to political speech.  Reimers testified that a 7-second delay was put into place (even though he disagreed with it) and there was no violation.  Rosenberg was suspended from WBAI for one week.

Vernile testified that under the doctrine of "positive control," he had a legal obligation as iED to address the multitude of financial and legal issues that threatened Pacifica's very existence.  On September 10, 2019, Vernile raised a number of issues with the WBAI local station board (the "LSB"); most significantly, that WBAI would not be able

to meet its next payroll.  WBAI only had raised $7,000 in a fund drive, far short of its

expected $75,000.  Someone on the WBAI LSB suggested that the staff should go without

pay.  Vernile responded that would be illegal.  When WBAI previously had been unable to

meet its payroll, it had "borrowed" from other Pacifica station's operating accounts,

which temporarily reduced funds in those operating accounts until WBAI paid back the

"loans" through fund raising drives or bequests.

G.  <u>NETA Informs Vernile that Pacifica Risked Being Out of Business Primarily Due to Issues with WBAI</u>.

On September 16, 2019, Vernile met again with NETA employees Swiderski and

Sims.  They told him that unless corrective measures were taken at WBAI, Pacifica would

be out of money in 60 days, and out of business in nine months.  A balloon payment on

the loan taken out to pay the Empire State Building judgment was coming due.  WBAI had

fallen far behind on its share of funding for NETA services, in fact, so far behind that its

reserves were exhausted.

Soon after, Vernile met with the transition team (then only Jacobs and Crosier)[7] to

discuss what he had learned at NETA.  Chris Cory, Pacifica's treasurer, also attended this

meeting.  All agreed that they needed to discuss with the PNB the issues that NETA had

raised.  However, they were unable to do so at the September 19, 2019 Board meeting.

On September 22, 2019, Swiderski told Vernile that WBAI could not meet its next

payroll and its payroll checks would likely bounce.   Vernile testified that he

communicated with Reimers, who told him that WBAI should put off paying the staff.

---

[7] Aaron was no longer a member of the transition team because she had been removed as PNB chair.

Vernile responded that to do so would violate the law.  Vernile told Reimers that if WBAI could not afford to pay its employees, Pacifica was legally obligated, both by law and as required by the Pacifica employee handbook, to lay them off.  Reimers testified that the normal practice was to "borrow" from other stations' accounts, and to repay those accounts when funds were raised.  According to Reimers, this was nothing new and not a big deal.

H.  Vernile Reports to the PNB.

On September 25, 2019, Vernile delivered a confidential report to the PNB.  In it, he described the financial crisis Pacifica found itself in, and explored various solutions, including staff reduction.  Vernile wrote: "Though some on the board have pushed for local staff layoffs as an option, they are not in the short-term interests of the listeners, the stations or in the Foundation's financial interest.  It will do significant long-term harm. The last time such action was taken at WBAI, it caused significant long-term damage to the station and the network."  Vernile testified that as of that date, layoffs were not in the plan because he had been informed that WBAI would meet its next payroll.

In his September 25, 2019 memo, Vernile also raised a number of other legal and compliance issues, including:

- The attempt to standardize the various union contracts which "would be considered bad faith bargaining under the NLRB Act";

- A proposal to air Oakland Raiders football games, which would risk Pacifica's non-profit status;

14

- Pacifica's reliance on "self-help" shows that raise "listener questions about potential product endorsements";

- Issues with regaining CPB requalification which would require "that we are able, over time, to fully adhere to all aspects of the CPB guidelines as well as all other federal, state and local laws governing non-profits, particularly in the areas of effective, conflict-free governance and financial stewardship."

The scheduled discussion of these issues never occurred because Aaron, Alex Steinberg, and a third director, Tom Voorhees, cancelled the scheduled September 26, 2019 PNB meeting.

I.    NETA Informs Vernile that WBAI Would Not Meet Payroll.

On September 27, 2019, Swiderski and Sarah Tennison, the NETA employee who managed Pacifica's payroll, informed Vernile that WBAI would not be able to meet its next payroll, and as a result, any WBAI payroll checks would likely bounce.  NETA senior executive Anita Sims additionally told Vernile that unless Pacifica developed a plan to address the financial deficit, NETA would resign from the account by the following month.  The loss of NETA would have meant the loss of accounting, payroll, and human resources services.

That day, Vernile debriefed Jacobs and Ford Greene, then Pacifica's General Counsel, on the deteriorating financial situation at WBAI.  WBAI had missed two payrolls, and fallen even further behind in its central service payments [to NETA], even though it had been reduced to 8% of its budget.  Other Pacifica stations paid NETA 15% of their

budgets.  An insurance payment was coming due; if it was not paid, WBAI would be in

default of loan covenants that specified that insurance was required.  If that occurred,

WBAI stood the chance of losing the loan it had acquired to pay off the Empire State

Building debt.

Vernile, Jacobs, and Greene concurred that something needed to happen.  They

agreed that something was a layoff at WBAI.  Greene told Vernile that he needed to

follow the law, *i.e.*, if staff could not be paid, they had to be laid off.  But Greene also

informed Vernile that the PNB would object, construing any staff layoff as termination of

their employment.

Also on that day, September 27, 2019, Vernile placed a warning letter in Reimers'

file, writing him up for the Rosenberg Labor Day incident.

J.    Events Leading Up to Oct. 7, 2019 Action at WBAI.

The transition team decided that it would poll PNB members to determine if they

supported the proposed layoff, but to exclude from the polling those PNB members who,

in their view, had a conflict of interest.  Greene wrote an opinion letter stating that the

New York directors were conflicted because their loyalty was to their local station (*i.e.*,

WBAI), not to Pacifica, where their legal duty of loyalty lay.

Crosier conducted the polling of purportedly non-conflicted PNB members,

excluding the WBAI-aligned directors (and Aaron).  He reported back to the transition

team that the majority of the polled PNB members supported a layoff.  On October 2,

2019, Vernile sent a letter to the polled PNB members, stating, in pertinent part:

> So with a sober understanding that the very survival of Pacifica
> is at stake, we will need to cease local staff operations at WBAI

> within 24 hours and operate the station via a remote Pacifica
> feed as allowed by FCC regulations.  As soon as logistically
> possible, a plan will be drawn up to address how we can rebuild
> the station into a vibrant local going operation.

FCC regulations prohibited any station to be off-the-air for more than a short

period.  Vernile and the transition team put into effect a programming plan for WBAI that

included syndicated programs and content from other Pacifica stations, named "The Best

of Pacifica."

Vernile met with Nelson, Pacifica's labor attorney, to ensure that any layoffs

would be conducted in accord with the law.  They planned to i) ensure continuity on the

air with the "Best of Pacifica" and syndicated programming, and ii) provide no advance

notice to WBAI staff, in order to ensure that there was no violence, destruction of

equipment, or FCC violations on the air (for example, swearing on-air).

On October 3, 2019, Swiderski, then serving as Pacifica's interim CFO, wrote to

Sharon Adams, Pacifica's treasurer and a Pacifica National Finance Committee member,

stating that WBAI had been unable to fund its payroll eight times in the current fiscal

year, and that it had "intercompany payables (amounts due to all other Pacifica units)

totaling $4.87M as of the end of FY18."  An excel spreadsheet Swiderski prepared

showed that WBAI had missed $321,232 in payments in 2019, including payments for

payroll, health benefits, and central services.

On October 6, 2019, Swiderski wrote a report to the PNB in which she stated that

the "current cash flow situation is dire," primarily due to issues at WBAI:

> putting a severe strain on National Office cash to the point that we no longer have
> a reserve to cover the next payroll for National Office or Pacifica Radio Archives

17

. . . . In the event that we are unable to maintain payments to our audit firm, they will withhold our audit.  This will prevent us from providing it to the California Attorney General's office as is required to maintain our non-profit status.  This would be disastrous.  As things are currently running, I don't see any room in the cash flow to keep current on vendor payments.  If we are to prioritize keeping such important vendors in place, then I'm not sure we can in good conscience keep WBAI staff working without the [sic] being certain of our ability to pay them for their time.

The regularly scheduled PNB meeting scheduled for October 6, 2019 was cancelled due to the absence of a quorum.

K.  <u>Events of October 7, 2019</u>.

On October 7, 2019, Vernile, PNB members Crosier and Adrienne LaFollette, Moe Thomas, chief engineer for WPFW, and two security guards entered the WBAI studios to shut local programming down.  No WBAI employees had been notified in advance of this action.  Two WBAI employees were at the studio.  Vernile and Crosier transferred the air signal to broadcast syndicated programs and the "Best of Pacifica."

Letters were delivered to staff and volunteers informing them of the action.  The evidence is conflicting as to whether the action was a layoff or employment termination.  The staff, including Reimers, interpreted the letters as informing them that their employment was terminated.  Indeed, the letters informed the staff that "Pacifica Foundation will be terminating staff at WBAI effective Monday, October 7, 2019" and instructing them about the process to apply for COBRA.  However, the press release that Vernile and others sent out that day describing the action stated that "[t]he Pacifica Foundation was forced to lay off the staff of its Brooklyn-based station."

Pacifica Bylaws prohibit the termination of a station's General Manager absent the agreement of the Executive Director and the LSB, or failing that agreement, the PNB.

18

*See Amended and Restated Bylaws of the Pacifica Foundation,* January 1, 2016,  Article Seven, Section 3 D.

L.   <u>Initial Litigation</u>.

The October 7, 2019 action caused an enormous uproar among the WBAI LSB, WBAI listeners, volunteers, and staff members, who strenuously objected to Vernile's actions.  Arthur Schwartz called Vernile to inform him that he was representing WBAI, would be suing Pacifica, and that Vernile should call counsel because Schwartz intended to go to court to obtain a TRO that very night.

Vernile contacted Pacifica's Washington D.C. FCC counsel, Foster Garvey, who put him in touch with a New York-based Foster Garvey partner, Kara Steger.  Ms. Steger represented Pacifica in the TRO hearing that night, which took place in the lobby of Judge Frank P. Nervo's apartment building.

Judge Nervo granted the TRO, enjoining Pacifica from:

- Seizing any property, offices, or equipment of WBAI;

- Terminating employees of WBAI;

- Preventing WBAI from broadcasting its regularly scheduled programming; and

- Interfering in the orderly administration of the business and affairs of WBAI.

Schwartz emailed Greene on October 8, 2019 informing him of the TRO.  Greene then emailed Jacobs and Vernile stating that he had advised them that they should seek PNB approval before taking any action with respect to WBAI, or, in the absence of a vote, to poll the Board.  He also stated that he understood that New York counsel was representing Pacifica in the litigation.

On October 10, 2019, a judge in the New York Appellate Division partially granted Pacifica's motion to vacate Judge Nervo's TRO Order, without prejudice to the New York Supreme Court's determination of the petition.  The court vacated nearly the entire TRO, with the exception that Pacifica continued to be enjoined from terminating WBAI employees.  Pursuant to this order, WBAI staff were paid during the time that local programming remained off the air, although they could not return to the station.

M.  The Three-Night PNB Meeting from October 10-12, 2019.

The PNB held a highly contentious telephonic board meeting, stretching over three nights, to consider whether to ratify Vernile's October 7 action.  PNB members aligned with WBAI were exceedingly upset with and opposed to Vernile's action.  PNB members aligned with Vernile (principally from other stations) supported the action.  Jacobs chaired the meeting and muted Aaron so that she could not speak.

The debate at this extended Board meeting centered on who was eligible to vote on the ratification of the October 7 action.  Greene advised Vernile that under applicable California law, certain members had a conflict of interest and thus could not vote.  Specifically, because PNB members Alex Steinberg and James Sagurton were plaintiffs in the litigation that resulted in the TRO (and additionally were from the WBAI LSB), and PNB member Shawn Rhodes was a paid employee of WBAI, Greene advised that they had a conflict of interest and therefore were ineligible to vote on the ratification.

In response, on October 11, 2019, Steinberg and Sagurton filed notices of dismissal from the lawsuit, first without prejudice, and subsequently, in response to Greene's advice on October 12 that they still were conflicted because they could reenter

the lawsuit, with prejudice.  However, Greene advised that the WBAI-aligned directors remained conflicted, because their loyalty was to the WBAI LSB, not to Pacifica, which is where their fiduciary duty lay.

The members who did vote ratified Vernile's action by a margin of two votes (9 to 7).  But if the full Board had voted (including the members who purportedly had a conflict) the action of shutting down local control of WBAI and discharging the staff would not have been ratified.

On October 12, 2019, Vernile filed a harassment complaint with NETA.  In his complaint, Vernile alleged that he was "working in a hostile work environment.  I believe I am the victim of harassment and intimidation by specific members of the Pacifica National Board of Directors and their agents.  I also have a genuine fear of retaliation.  I have been physically effected [sic] by physical symptoms as a result."  Vernile testified that he stopped attending PNB meetings because he was receiving threats, including death threats against him and his family.  Jacobs corroborated this testimony.

N.  The October 13th Board Meeting.

On October 13, 2019, Aaron called a special meeting of the PNB with less than twelve hours-notice.  None of the nine PNB members who had voted in favor of ratifying Vernile's actions attended the meeting.  Two resolutions passed by a vote of 12-0:  the first, rescinding the previous ratification of Vernile's actions on October 7, and the second, suspending Vernile from his position of Executive Director on the basis that he:

- Terminated WBAI's General Manager;

- Took local WBAI programming off the air;

- Seized control of WBAI's broadcast signal;

- Redirected the website wbai.org to broadcast content that he chose;

- Announced to the public that WBAI was off the air;

- Broke into the office of another tenant in WBAI's building; and

- Retained Foster Garvey to appear in court to defend the lawsuit.

The PNB members who met on October 13, and subsequently, on October 20, 2019 (discussed below), did not discuss other issues; for example, there was no discussion of the Rosenberg Labor Day incident, the disagreement about the union contracts, self-inurement claims, or any other compliance or legal issues.

Greene advised Crosier, Jacobs, and Vernile that the October 13, 2019 PNB meeting failed to comply with California law, which requires at least 48 hours-notice for a special meeting of a Board.  He also advised that directors Steinberg, Rhodes, and Sagurton were conflicted from voting "on matters within the scope of the WBAI lawsuit." He further advised that because Aaron was working with Arthur Schwartz "in a way that is adverse to the interests of the Foundation" she was conflicted and could not legitimately "vote on matters within the scope of the WBAI lawsuit."

On the basis of Greene's advice that the October 13 PNB meeting was not properly called, and that therefore, the vote taken at the meeting was not legitimate, Vernile continued in his duties as Pacifica iED.  Foster Garvey continued to represent Pacifica in the subsequent legal proceedings related to the shutdown of WBAI.

On October 13, 2019 at 9:54 p.m. EDT, Steinberg set a special meeting of the PNB for 6:00 p.m. on October 20, 2019.

O.  <u>Vernile Removes the State Court Action to Federal Court</u>.

Vernile, on behalf of Pacifica, removed the pending state court action to federal court on the basis of subject matter jurisdiction, *i.e.*, that FCC laws or regulations were at issue.  On October 15, 2019, the Honorable Paul A. Engelmayer of the Southern District of New York granted Pacifica's motion for a TRO and an order to show cause as to why a preliminary injunction should not be granted enjoining the petitioners (*i.e.*, the WBAI complainants) from:  (i) implementing the October 13 PNB motions, (ii) disregarding the properly passed October 12 PNB motions until the Court ruled on the October 13 motions, (iii) holding any improperly noticed PNB meetings.  Judge Engelmayer also enjoined Arthur Schwartz from contacting Pacifica employees and PNB members regarding the subject of the litigation without prior consent from Pacifica counsel (*i.e.*, Foster Garvey).  On October 16, 2019, Judge Engelmayer reaffirmed that Order and reminded the litigants of their continuing obligations under that Order and the Nervo Order, as modified by the New York Appellate Division.

P.  <u>The October 20 Board Meeting</u>.

On October 17, 2019, Greene advised Jacobs (the then-Chair of the PNB) that the setting of the October 20 special meeting failed to comply with the seven-day notice requirement as set forth in the Pacifica Bylaws, Article Six, Section 4.  He also advised that the meeting violated Judge Engelmeyer's October 15 and 16 Orders described *supra*.

Nonetheless, the WBAI faction of the PNB held the special meeting on October 20, 2019.  Crosier, Jacobs, and Vernile did not attend.  The Motion to Rescind the PNB ratification of Vernile's October 7 action was approved without objection.  The PNB

waived any conflicts "that may or may not exist" regarding directors Sagurton, Steinberg, and Rhodes with respect to the vote on the Motion to Rescind.  Crosier and Jacobs were removed from their positions as, respectively, Secretary and Vice Chair.  Steinberg was elected Chair; Aaron was elected Secretary.  Greene was removed as Pacifica's General Counsel.  A motion to "Restore WBAI" passed.

Q.  <u>Subsequent Legal Actions in Federal and State Court/Justice Crane's Ruling</u>.

On October 21, 2019, Judge Engelmayer ordered the case be remanded to the state court on the basis of lack of federal subject matter jurisdiction.  On October 28, 2019, the Honorable Melissa A. Crane of the New York Supreme Court extended the original TRO, as modified, until November 6, 2019, the date she scheduled for a hearing on an Order to Show Cause as to why certain PNB members, including those who had been excluded from the October 12, 2019 Board vote, should not be able to join the petition for a preliminary injunction.

On November 6, 2019, Justice Crane, ruling from the bench, held that the Pacifica Bylaws, not California law, governed whether the directors who had not been permitted to vote at the October 12, 2019 PNB meeting had a conflict of interest.  She ruled they did not because the Bylaws' conflict of interest rules "clearly contemplate a pecuniary interest," which Sagurton and Steinberg did not have.  She ruled that Rhodes, as a staff member of WBAI, did have a pecuniary interest and therefore a conflict of interest.  On that basis, she ruled that the October 12 PNB vote ratifying Vernile's October 7 actions must be set aside because it was conducted in violation of Pacifica Bylaws.

Justice Crane then addressed the issue of whether the October 20, 2019 PNB vote to ratify the October 13, 2019 resolution was legitimate.  Pacifica contended that the vote was not legitimate because it was not held on seven days' notice, as defined by the California Code of Civil Procedure.  Justice Crane rejected that argument, finding that the Pacifica Bylaws, not the California Code, applied to the issue of proper notice, and that in fact, under the Bylaws, proper notice had been given.  On that basis, she found that the October 20, 2019 PNB vote was the only legitimate vote on the issue of whether to ratify the October 7 action.

On November 7, 2019, Justice Crane granted WBAI's motion for a preliminary injunction on the same terms as Judge Nervo's original TRO.  WBAI local programming resumed.

R.   The PNB Terminates Vernile's Employment.

On November 14, 2019, the PNB voted to terminate Vernile's employment for cause and so informed him in writing.

S.   WBAI Fundraising.

In the six days in October before the October 7 action, WBAI had raised $43,716.06, averaging $7,286.01 a day.  When programming was switched to "repeater" programming, fundraising came to a virtual standstill.

 However, fundraising caught up once local programming resumed.  On February 9, 2021, Sharon Adams reported to the National Finance Committee that "we now have the actual financial figures for Oct. Nov. and Dec. of 2019, and for Oct. Nov. and Dec. 2020.  A comparison of the figures shows that WBAI brought in essentially the same

amount of revenue in Oct/Nov 2019 as in Oct/Nov 2020.  There was a minor difference of

about $3000 between these two periods.  So now there is concrete evidence that the

events of Oct. 2019 did not actually affect the revenue stream of WBAI."

    T.   <u>Rally in Support of WBAI; Denunciations of Vernile</u>.

       Supporters of WBAI held a rally in support of local programming and in opposition

to the shutdown where many prominent New Yorkers appeared.  Speakers at the rally

denounced Vernile, claiming that he was part of a "rogue" group that had staged a

"coup" with the intent to sell WBAI and its signal to benefit other stations.  A number of

WBAI programmers, including WBAI Program Director Linda Perry, discussed the October

7 action on the air, repeating the claim that Vernile had been hired to sell WBAI and its

signal and was part of a rogue group that had staged a coup.  Other programmers called

him a "rat," a "crook" and other epitaphs.  Rosenberg circulated an email calling Vernile

"John Vermin."

       Vernile testified that after the October 7 action, he and his family received death

threats and email messages including one that said, "I know where you and your family

live."  His email was doxed, resulting in a massive number of threatening and derogatory

emails.  He feared for his and his family's safety.

       On May 4, 2020, Vernile filed his Demand in arbitration.  Pacifica counterclaimed

on August 7, 2020.

V.      THE PARTIES' CONTENTIONS

       Vernile contends that Pacifica terminated his employment in violation of Cal.

Labor Code §1102.5, California's whistleblower statute.  He also contends that his

26

termination was wrongful because it occurred in violation of California's public policy.  He finally claims that Pacifica defamed him through broadcasts on WBAI.

Pacifica claims that it fired Vernile because he exceeded his authority when he took WBAI local programming off the air and terminated its staff, including its General Manager.  In its counterclaim, Pacifica contends that Vernile breached his employment agreement by hiring Foster Garvey in October 2019 in the WBAI litigation without authorization from the Board, and further, that Vernile damaged WBAI's fundraising drive when he removed local programming.

These contentions are analyzed below.

VI.    ANALYSIS OF VERNILE'S CLAIM

A.  Vernile has Failed to Prove by a Preponderance of the Evidence his Wrongful Termination Causes of Action.

This Tribunal is not addressing nor making any judgment about whether Vernile's action in taking WBAI's local programming off the air was an appropriate step taken to address Pacifica's financial crisis, or whether one or the other Board faction acted appropriately in either ratifying or not ratifying Vernile's actions.  Those issues are not before this Tribunal.  Rather, the issue before this Tribunal is whether Vernile has proven, by a preponderance of the evidence, that Pacifica violated California law when it terminated his employment.

The Agreement provided that Vernile was an at-will employee.  Accordingly, Pacifica could terminate his employment for any reason, as long as that reason was not unlawful.  *Tameny v. Atlantic Richfield Company,* 27 Cal. 3d 167, 172 (1980).

Vernile has failed to meet his burden of proof that Pacifica discharged him because he was a whistleblower, or that it otherwise terminated his employment in violation of public policy.  Although Vernile has succeeded in establishing a *prima facie* case that his reporting of various violations of laws and regulations was a contributing factor in the termination of his employment, Pacifica has proven by clear and convincing evidence that the PNB terminated his employment primarily because it decided that he had exceeded his authority when he shut down WBAI's local programming and discharged its staff without full PNB approval.

1. *Vernile's whistleblowing cause of action fails.*

Cal. Labor Code § 1102.5 (b) provides, in pertinent part:

> An employer, or any person acting on behalf of an employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information . . . to a person with authority over the employee . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation . . . .

Cal. Labor Code § 1102.5 (c) provides, in pertinent part that:

> An employer, or any person acting on behalf of an employer, shall not retaliate against an employee for refusing to participate in an activity that would result in the violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

As an initial matter, contrary to Pacifica's erroneous assertion in its closing brief, California's whistleblower law protects not only those who report violations of the law and regulations to government authorities, but "internal whistleblowers," that is, employees who report violations of the law and regulations to "a person with authority

over the employee."  The law was amended effective January 1, 2014 to provide that

expanded protection.  *See* California SB 496, dated October 12, 2013.

The evidence is that Vernile reported to the Pacifica body with authority over him,

the PNB[8], various violations of the law and regulations, or at a minimum, his reasonable

belief that laws and regulations had been violated.  *See McVeigh v. Recology San*

*Francisco*, 213 Cal. App. 4th 443, 448, 471 (2013) (reasonable belief that an activity is

against the law suffices under the statute).

As described *supra*, in his September 25, 2019 memo, Vernile reported to the

PNB numerous violations or potential violations of the law and regulations, including the

attempt to standardize the various union contracts which "would be considered bad faith

bargaining under the NLRB Act"; the proposal to air Oakland Raiders football games,

which would risk Pacifica's non-profit status; self-inurement on various programs, which

would jeopardize Pacifica's non-profit status; and issues with regaining CPB

requalification which would require compliance with various laws and regulations.

He also reported to the WBAI LSB, which included members of the PNB (Sagurton

and Steinberg) that failure to pay WBAI employees would violate federal and state laws.

Vernile reported to other individuals within Pacifica numerous violations of laws and

regulations, including Rosenberg's failure to comply with FCC regulations concerning

political programming.  Members of the PNB were thus aware of Vernile's reports of

---

[8] The Tribunal rejects Vernile's argument that the transition team had authority over him for purposes of the whistleblowing statute.  The Agreement provided that Vernile would "be supported by, and will work with, a transition team during at least the first three months of employment."  *Agreement* at ¶ 1.  The Agreement did not provide that he reported to the transition team, nor did it provide that the transition team had any authority over him.  However, because Vernile reported violations of the law and regulations to the PNB and its members, this issue is immaterial.

compliance and legal violations.  The evidence is that his stance on these violations, including the Rosenberg Labor Day incident, adhering to the negotiated union contracts, self-inurement, health and beauty programming, and most particularly his attempts to bring WBAI into compliance, caused friction between him and members of the PNB affiliated with or allied with WBAI.  After Vernile wrote his September 25, 2019 memo reporting these violations, the PNB meeting was cancelled.  The subsequent October 6 meeting was also cancelled by WBAI-affiliated directors due to lack of a quorum.  These actions provide strong evidence that the PNB (or at least the WBAI-aligned faction of the PNB) was resistant to Vernile's reports of legal and compliance violations.

Vernile has met his burden of showing, by a preponderance of the evidence, that a retaliatory motive for these complaints was a contributing factor in his termination. *See Lawson v. PPG Architectural Finishes, Inc.*, 2022 WL 244731 at *5 (Jan. 27, 2022) (plaintiff may satisfy burden of proving unlawful retaliation even where other factors contributed to adverse action).

Labor Code § 1102.6 provides that once the employee has demonstrated by a preponderance of the evidence that the "activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee," the burden shifts to the employer to establish, by clear and convincing evidence, that it would have taken action against the employee for legitimate, independent reasons, even if the employee had not engaged in activities proscribed by Section 1102.5.  *Lawson* at *8.

Pacifica has met its burden of establishing by clear and convincing evidence that it terminated Vernile's employment because the PNB believed that he had exceeded his

30

authority by discharging WBAI staff and shutting down its local programming without full

PNB approval, and that further, that he exceeded his authority by not reversing that

decision until ordered to do so by Justice Crane.[9]  Pacifica has established that it would

have terminated Vernile's employment even if he had never complained about other

legal violations.  While it is true that retaining employees without being able to pay them

would violate various laws, the weight of the evidence is that the PNB terminated

Vernile's employment not because he raised this issue, but because in the PNB's opinion,

he exceeded his authority.

    2.   *Vernile's claim for wrongful termination in violation of public policy fails.*

To prevail on his cause of action for wrongful termination in violation of public

policy, Vernile must have proven, by a preponderance of the evidence, that his

employment termination resulted for reasons "contrary to public policy as expressed in

*statutory or constitutional mandates*."  *Stevenson v. Superior Court*, 16 Cal. 4th 880, 887

(1997) (emphasis added).

Labor Code § 1102.5 is the sole statute that Vernile contends Pacifica violated.

He has cited no constitutional mandate that Pacifica violated.  The Tribunal has found

that Pacifica did not terminate Vernile's employment in violation of § 1102.5.  Having

failed to prove that he was fired in violation of a statute or any constitutional mandate,

---

[9] Because it is not relevant to this Award, the Tribunal does not address Respondent's collateral estoppel argument, *i.e.*, that Justice Crane's decision about the applicability of the Pacifica Bylaws, not California law, to Board notice and conflicts of interest is conclusive.  Moreover, Vernile complied with Justice Crane's November 6 order.

Vernile has not met his burden of proof to show that Pacifica discharged him wrongfully in violation of public policy.

      B.  <u>Vernile has Proven that Pacifica Defamed Him</u>.

In evaluating this cause of action, the Tribunal listened to several WBAI audio files entered into evidence by Claimant.  These recordings were not introduced through a witness at the hearing, but admitted through a process the Tribunal adopted for the admission of evidence.[10]  Pursuant to this Tribunal's December 6, 2021 Procedural Order for Evidentiary Hearing ("Procedural Order"):

> Exhibits that are not introduced through a witness will be deemed
> admissible only if the parties stipulate to their admissibility or, in the
> event of a disagreement as to admissibility, ruled admissible by the Arbitrator.

*Procedural Order* at ¶ 10(d).

Pursuant to this procedure, Claimant sought to enter into evidence audio files that consisted of WBAI broadcasts.  Respondent objected.  In an Order dated February 1, 2022, the Tribunal ruled that certain audio files would be admitted, but that Claimant "must identify which statements he alleges are defamatory, and identify the specific recording and time stamp of the allegedly defamatory statement." *February 1, 2022 Ruling on Exhibits Not Admitted Through Witness* at ¶ 1.  In order to provide Respondent with the opportunity to listen and respond to the allegedly defamatory statements, the Tribunal ruled that "[t]o ensure that Respondent has the full opportunity to assert its

---

[10] The AAA Employment Rules apply to this dispute.  AAA Employment R-30 provides, in pertinent part:  "if the parties agree or the arbitrator directs that documents may be submitted to the arbitrator after the hearing, the documents or evidence shall be filed with the AAA for transmission to the arbitrator, unless the parties agree to a different method for distribution.  All parties shall be afforded an opportunity to examine such documents or other evidence and to lodge appropriate objections, if any."  Respondent had this opportunity.

argument with respect to any statements identified in Claimant's closing brief, rebuttal closing briefs will be permitted."   *Scheduling Order* # 4 at ¶ 7.  Both parties filed rebuttal briefs pursuant to this Order.

In his closing brief, Claimant complied with this Tribunal's February 1, 2022 Order. He identified the allegedly defamatory statements, included time stamps, and even provided a hyperlink to the audio files in DropBox, the exhibit repository.  The Tribunal has listened to all of the identified purported defamatory statements.  As described *infra*, It finds that some, but not all of the statements, are slander *per se*.

Under California law, slander *per se* is:

A false and unprivileged publication, orally uttered, and also communications by radio . . . which [t]ends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profit  . . . .

California Civil Code § 46.

Some of the identified statements are opinions, and thus are not actionable as slander.  The expression of an opinion, as opposed to a "provably false factual assertion" is privileged and protected under the First Amendment to the U.S. Constitution, and cannot be considered defamation.  *Seelig v. Infinity Broadcasting,* 97 Cal. App. 4th 798, 809 (2002) (citations omitted).

In *Seelig*, the Court of Appeal found that statements on a radio talk show that called the plaintiff "a chicken butt," a "local loser," and a "big skank" were not defamatory because they were opinions, not actual provably false facts about the plaintiff.  *Id.* at 810.  The court continued:

> Although sophomoric and in bad taste, the comments are just the type of "name-calling of the 'sticks and stones will break my bones' variety" that the court in *Ferlauto* found to be not actionable as a matter of law (citation omitted).

> *See also*, *Leidholdt v. L.F.P., Inc.*, 860 F. 2d 890, 894 (9th Cir. 1988) (statements in *Hustler* that the plaintiff was a "pus bloated walking sphincter," "wacko," and "twisted", to name a few epitaphs, were protected opinions, not false statements of fact).

Certain statements made in the WBAI radio broadcast exhibits fall into the category of opinion, not fact:  *e.g.*, that Vernile was a "crook," a "rat," and that he was fulfilling a "neo-liberal agenda" based on racist and class-based prejudices.[11]  These statements are sophomoric, humiliating, and made in bad taste.  But they are precisely the kind of "sticks and stones" statements that the *Seelig* court found to be expressions of opinion, however rude and uncalled for.

However, statements also were made on WBAI broadcasts that were false statements of fact.  Examining the totality of the circumstances, as required by California law (*see Seelig,* 97 Cal. App. 4th at 809), the Tribunal finds, as a matter of law, that the below-described statements made on air at WBAI were slander because they were demonstrably and provably false statements of fact.

 Linda Perry, WBAI's program director, stated on a December 20, 2019 WBAI broadcast that Vernile was hired to carry out a plan to sell WBAI for "millions and millions of dollars to benefit the other stations" and that he was part of a "rogue group" who had staged a "coup."  On November 7, 2019, Perry stated that the plan had been "in the

---

[11] Some of these offensive, derogatory statements were also made in writing.  For example, Rosenberg circulated an email on November 1, 2019 entitled "John Vermin has got to go!"

works for a long time, to dump WBAI."  Perry also broadcast the following statements

made by Rosenberg at the October 7, 2019 rally: "the name you need to know is John

Vernile, a newly hired Pacifica ED who was brought on board as part of a plan to steal our

station . . . who got a six month contract and immediately sucked the juice out of WBAI

. . . . many people want to sell [WBAI's] license towards the end of propping up their own

flagging resources."

These were demonstrably false statements.  There simply is not a shred of

evidence that Vernile was hired to sell or to "steal" WBAI or its signal (indeed, it was the

PNB that hired him, with Aaron signing his employment agreement), or that his intention

in shutting down local programming on October 7 was to sell WBAI or its signal.  Vernile

testified that he never believed it was a good idea to sell the WBAI or its signal.  His plan

was to stabilize WBAI, and then to resume local broadcasting.  His October 2, 2019 letter

to the PNB[12] articulated the plan:

> So with a sober understanding that the very survival of Pacifica
> is at stake, we will need to cease local staff operations at WBAI
> within 24 hours and operate the station via a remote Pacifica
> feed as allowed by FCC regulations.  *As soon as logistically
> possible, a plan will be drawn up to address how we can rebuild
> the station into a vibrant local going operation.*  (emphasis added).

The alleged "plan" to sell WBAI and its signal was a rumor widely circulated and

repeated by WBAI staff and PNB members affiliated with WBAI.  On October 11, 2019,

Board member Alex Steinberg told a reporter for the *Brooklyn Paper* that "Their game

---

[12] As addressed *supra*, this letter did not go to the entire PNB Board.  It is cited here as evidence that
Vernile's intent was to reorganize WBAI on solid financial and legal footing, not to sell the station or its
signal to benefit other Pacifica stations.

plan I believe was to sell the signal."  But Steinberg expressed this as a "belief," not a fact.
Perry's remarks (as well as Rosenberg's) transmuted that erroneous belief into a fact.
But that "fact" was false.

Likewise, Vernile was not part of a "rogue group" that staged a "coup."  Vernile
was the iED of Pacifica, Crosier and LaFollette PNB members, and Moe Thomas the chief
engineer for WPFW.  There was no "coup."  WBAI has always been a part of Pacifica; it is
not an independent entity.  At the time, Vernile was the iED of Pacifica.  Crosier and
LaFollette were PNB members.  Although they did not represent the majority of the PNB,
they did represent a significant minority.

Perry also falsely stated that Vernile told WBAI's landlady that WBAI would be
shut down and would leave the building.  Contemporaneous documentary evidence
proves that the landlady was in Florida on October 7 taking care of her ailing mother.
Crosier spoke to her on October 7 and told her that she should talk to Vernile about
whether it made sense to hold the space for WBAI without being paid  "although we
wanted to bring local programming back sometime soon," further evidence that there
was no plan to sell WBAI or its signal.

Pacifica, as Perry's employer, is vicariously liable for Perry's defamatory
statements, which were made within the scope of her employment.  Under California
law, an employer is responsible for the "willful and malicious torts of an employee,"
including defamation, for purposes of vicarious liability.  *McLachlan v. Bell*, 261 F.3d 908,
911 (9th Cir. 2001).

Under California law, Vernile was a "limited-purpose public figure," defined as a person who is drawn into a public controversy. *Copp v. Paxton*, 45 Cal. App. 4th 829, 845 (1996). The WBAI shutdown and Vernile's role in it became a matter of vigorous public debate in the New York region, and became a national story through the publication of articles in publications like the New York *Times*. Accordingly, as a limited public figure, Vernile must have proven by clear and convincing that Pacifica (through its programmers, including Perry and Rosenberg) acted with reckless disregard for the statements' truth or falsity. *Id.* at 846-47. He has done so.

The California Supreme Court has held that a plaintiff may prove reckless disregard for the truth by circumstantial evidence, including "[a] failure to investigate [citation omitted], anger and hostility toward the plaintiff [citation omitted], reliance on sources known to be unreliable [citations], or known to be biased against the plaintiff . . . ." *Reader's Digest Assn. v. Superior Court*, 37 Cal. 3d 244, 258 (1984).

Vernile has met this burden. He has shown by clear and convincing evidence that Perry, along with other supporters of WBAI, including those on the PNB, were colossally hostile towards Vernile. As just one example, when Vernile first began working at Pacifica, Aaron told him that she was 100% behind him, but that if he hurt Pacifica she "would destroy him." Apparently that was the attempt.

Vernile was denounced in public and called "vermin." He was called a "rat" and a "crook" on the air. Although these sophomoric epitaphs do not constitute slander, as explained *supra*, they nonetheless reveal the maliciousness Vernile faced; so much so that he feared for his and his family's safety. In this highly charged and vitriolic

environment, it is no wonder that Perry (and others) did not investigate claims they made on air to determine their truth or falsity.  They were in an echo chamber, repeating falsehoods as received wisdom, when in fact the falsehoods were simply that.

Vernile's career has been in broadcasting.  The widely distributed slanderous statements described *supra* have been injurious to his professional career.  What broadcaster would want to hire someone who had acted as a "rogue" and staged a "coup?"  Who would want to hire someone who surreptitiously sought to sell off a station's assets?  Or who told the station's landlady to find a new tenant, potentially leaving the station without a home from which to air programming?

These statements fit squarely into California's statutory definition of slander *per se.*  As such, the damage to Vernile's reputation is conclusively presumed.  Proof of actual damages is not required.  *Contento v. Mitchell*, 28 Cal. App. 3d 356, 358 (1972).

VII.    ANALYSIS OF PACIFICA'S COUNTERCLAIMS

Pacifica's causes of action against Vernile are all grounded in its claim that he breached his employment agreement, which incorporated Pacifica's Bylaws.  But an examination of each of Pacifica's causes of action shows that it has not met its burden of proof.[13]

1.  *Pacifica cannot show that it was damaged by losing days from its October fundraising drive.*

Vernile's employment agreement provided, in pertinent part, that "[t]he Pacifica National Board expects the interim Executive Director to increase the total revenue . . . of

---

[13] Because Pacifica offered no evidence to support its claim for recovery of fees expended to defend against Vernile's U.S. Department of Labor whistleblowing suit, that claim fails.

our stations through good management . . . ."  Although Pacifica has not articulated a

legal theory under which it claims that Vernile damaged it by aborting the WBAI October

fund drive, the Tribunal will assume that it is based on a breach of that provision of the

Agreement, and thus is a cause of action for breach of contract.

However, proof of damages is an essential element of any cause of action for

breach of contract.  *See Acoustics, Inc. v. Trepte Construction Co.*, 14 Cal. App. 3d 887,

913 (1971).  Pacifica has failed to prove that it suffered any damages by the loss of

fundraising revenue during the month of October.  While it produced a document

showing a falloff in fundraising revenue directly after October 7, 2019, when local

programming was taken off the air, Treasurer Grace Adams' report shows that, in fact,

after the restoration of local programming, fundraising increased in November and

December 2019.  Indeed, those fundraising numbers exceeded the amounts raised in the

corresponding period in 2020.

Accordingly, Pacifica's cause of action for breach of contract based on the

October aborted fund drive fails.

2. *Vernile did not act outside of his authority by hiring Foster Garvey to represent Pacifica.*

The Agreement provides, in pertinent part, that Vernile "shall have no authority

to enter into any contracts binding upon Pacifica, or to deliberately create any obligations

on the part of Pacifica, except as may be specifically authorized by the Pacifica National

Board."  Although Pacifica did not articulate a legal theory for its claim that Vernile had

no authority to pay Foster Garvey during the WBAI litigation, the Tribunal will assume

that the claim is based on a breach of that provision in the Agreement.  There is no

provision in the Pacifica Bylaws requiring PNB approval for expenditures.

Foster Garvey had been Pacifica's FCC counsel for thirty years.  Vernile did not

enter into any new contract with Foster Garvey for its representation in the WBAI

litigation.  And until Justice's Crane's November 7, 2019 Order that provided that i) the

WBAI-aligned board members did not have a conflict with respect to the vote ratifying

Vernile's actions; and ii) that the October 20, 2019 Board meeting was properly noticed,

Vernile remained Pacifica's interim Executive Director.  No court order stated otherwise.

Indeed, the October 7, 2019 TRO, as modified on October 10, 2019, provided only

that WBAI staff had to be paid, not that one faction of the Board or the other had the

authority to ratify Vernile's actions.  One faction of the Board ratified Vernile's actions;

one faction did not and suspended his employment.  Given that these conflicting Board

directives were not resolved until Justice Crane's ruling, Vernile remained interim

Executive Director with all the powers and duties vested in him by the Agreement, that is,

until that ruling.

Accordingly, Vernile did not breach the Agreement by using Pacifica's long-time

FCC counsel to defend Pacifica in the WBAI litigation.

VIII.    AWARD

Vernile is the prevailing party on his claim and Pacifica's counterclaim.  Vernile has

proven that Pacifica defamed him.  He has failed to prove that Pacifica wrongfully

terminated him in violation of Cal. Labor Code § 1102.5 or in violation of public policy.

Slander *per se* does not require actual proof of damages.  The Tribunal awards Vernile

**$300,000** in damages.  The Tribunal declines to award punitive damages.

Pacifica has failed to meet its burden of proof on any of its counterclaims and is

entitled to no damages.

The administrative fees and expenses of the AAA totaling $2,950.00 are to be

borne as incurred.  The compensation of the Arbitrator totaling $51,150.00 is to be borne

as incurred.

This Final Award is in full satisfaction and settlement of all claims submitted in this

arbitration and disposes of each and every claim of each of the parties.  Any relief not

awarded above is hereby expressly denied.

IT IS SO ORDERED.                                  April 18, 2022

Dana Welch
Arbitrator