**FOR PURPOSE LAW GROUP**
May L. Harris, Esq. (Cal. SBN 211210)
Matthew B. Learned, Esq. (Cal. SBN 255499)
408 Nutmeg St.
San Diego, CA 92103
Tel:    (619) 780-3839
Fax:   (619) 780-2451
Email: mlearned@forpurposelaw.com

Attorneys for Respondent,
Pacifica Foundation Inc., a California nonprofit public benefit corporation

ARTHUR Z. SCHWARTZ
Advocates for Justice, Chartered Attorneys
225 Broadway, Suite 1902
New York, NY 10007
Tel.: 212-285-1400
Fax: 212-285-1410
Email: aschwartz@afjlaw.com

Proposed Attorneys for Respondent,
Pacifica Foundation Inc., a California nonprofit public benefit corporation

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN C. VERNILE,<br><br>                              Petitioner,<br><br>      vs.<br><br>PACIFICA FOUNDATION INC., a California Nonprofit Public Benefit Corporation,<br><br>                              Respondent.<br>_____<br>PACIFICA FOUNDATION INC., a California Nonprofit Public Benefit Corporation,<br><br>                              Cross-Petitioner,<br><br>      vs.<br>JOHN C. VERNILE,<br><br>                              Cross-Respondent. | Case No.  2:22-cv-02599-SVW-PVC<br><br>**PACIFICA FOUNDATION, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD AND CROSS-PETITION TO VACATE ARBITRATION AWARD**<br><br>[9 U.S.C. § 10] |

Pursuant to the Federal Arbitration Act, Respondent/Cross-Petitioner Pacifica Foundation, Inc. ("Pacifica" or "Respondent") by its undersigned counsel, hereby (a) opposes Petitioner/Cross-Respondent John C. Vernile's ("Petitioner") Petition to Confirm the April 18, 2022 Arbitration Award rendered by Arbitrator Dana Welch in favor of Petitioner and against Pacifica (the "Arbitration Award"), and (b) cross-petitions the Court for an order vacating the Arbitration Award.

## NATURE OF THE PROCEEDINGS

This proceeding arises out of an arbitration (the "Arbitration") conducted before Arbitrator Dana Welch ("Arbitrator Welch") pursuant to an employment agreement (the "Agreement") between Pacifica and Petitioner.  In the Arbitration, Petitioner, asserted claims against Pacifica for wrongful termination and whistleblower retaliation.  Petitioner claimed that mere months after being hired as Pacifica's Interim Executive Director, he was terminated for vocalizing concerns about Pacifica's business practices.  Pacifica defended the Arbitration on the ground that Petitioner was fired for terminating all WBAI (Pacifica's New York radio station) staff and taking WBAI's programming off the air without proper approval from Pacifica's Board of Directors (the "Board").

During the Arbitration hearing before Arbitrator Welch, Pacifica presented evidence that Petitioner, who reports directly to the Board, fired[1] all WBAI staff, without the Board's authorization and refused to take corrective action – despite being directed to by the Board – until ordered to do so by the New York Supreme Court.  Thus, Arbitrator Welch properly determined that Petitioner's termination was the direct result of his insubordination not his attempt to bring any of Pacifica's business practices to light.

After the close of evidence, and upon the realization that Petitioner was not going to be successful on his wrongful termination causes of action, Petitioner

---

[1] Petitioner attempted to improperly classify the termination of the WBAI employees as "layoffs."

attempted to present evidence regarding a purported defamation claim. Pacifica objected to Petitioner being allowed to submit 14 hours of audio recordings that were not authenticated or otherwise attached to any live testimony without reopening the Arbitration hearing and being given the opportunity to present evidence in defense of the new defamation claim.

Over the objections of Pacifica, Arbitrator Welch considered the recordings as evidence only allowing Pacifica the opportunity to submit a short 10-page reply brief in response. This misbehavior denied Pacifica the opportunity to present relevant evidence and the opportunity to address how the defamation claims abridged its free speech rights as protected by California's anti-SLAPP statute. By doing so, Arbitrator Welch prejudiced Pacifica by directly compromising the fairness of the Arbitration process. For that reason, Pacifica respectfully requests that the Court vacate the Arbitration Award pursuant to section 10(a)(3) of the Federal Arbitration Act (Title 9 of the U.S. Code), which empowers this Court to vacate an arbitration award where the arbitrator refuses "to hear evidence pertinent and material to the controversy" or engages in "any other misbehavior by which the rights of any party may have been prejudiced." 9 U.S.C. § 10(a)(3). Moreover, the manner in which Arbitrator Welch "calculated" Petitioner's assumed damages based on her theory of defamation *per se*, without a scintilla of evidence relating to Petitioner's harm purportedly caused by the defamation, strongly corroborates the other evidence that Pacifica was denied basic due process.

The Arbitration Award should also be vacated pursuant to section 10(a)(4) of the Federal Arbitration Act, which empowers courts to vacate an arbitral award that rests on an exercise of power the arbitrator did not have. As shown below, the alleged defamatory statements were made ***after*** Petitioner's termination and therefore did not arise out of his employment with Pacifica. As Petitioner's defamation claim fell outside of the scope of the Agreement's arbitration provision, Arbitrator Welch lacked the authority to make any substantive ruling on this claim.

**PACIFICA FOUNDATION, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD**
**AND CROSS-PETITION TO VACATE ARBITRATION AWARD**

## **RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD**

Pacifica answers the Petition, in accordance with the numbered paragraphs thereof. Pacifica denies all allegations in the Petition not specifically admitted herein and further responds as follows:

1.      The allegations of Paragraph 1 are admitted.

2.      The allegations of Paragraph 2 are admitted.

3.      The allegations of Paragraph 3 are denied. The arbitration agreement (Petitioner's Exhibit A) states on page 7, Section 13(b): "The parties have to further agree that any action brought to enforce any rights or obligation under this Agreement shall be subject to the *exclusive jurisdiction* of the courts of the State of California" (emphasis supplied).

4.      The allegations of Paragraph 4 are denied.

5.      The allegations of Paragraph 5 are admitted.

6.      The allegations of Paragraph 6 of the Petition are denied. The contract annexed as Exhibit A to the Petition is a "Draft Agreement." The full final agreement is compromised of Petitioner's Exhibit A, together with Petitioner's signed offer letter attached to Pacifica's Cross-Petition as Exhibit 1.

7.      The allegations of Paragraph 7 are admitted to the extent that they quote some, but not all, of the arbitration language in the Draft Agreement. Respondent emphasizes that the arbitration clause in that agreement stated that "[i]n the unlikely event of a dispute between Pacifica and Employee ***arising out of Employee employment and termination of employment***: Pacifica and Employee agree to submit dispute to final and binding arbitration." This clause did not include disputes which did not "arise out of Petitioner's employment, or arose after the termination of Petitioner's employment.

8.      The allegations of Paragraph 8 are denied. Petitioner was terminated by unanimous vote of the Pacifica Board of Directors on November 14, 2019.

/ / /

9.      Respondent denies the allegation of Paragraph 9 of the Petition to the extent that Petitioner commenced the arbitration process by submitting his formal demand for arbitration on November 15, 2019.   A true and correct copy of Petitioner's November 15, 2019 arbitration demand, which states that Petitioner was "*protesting [his] termination as being in violation of the terms of my employment agreement and in violation of federal and California state laws*," is attached to Pacifica's Cross-Petition as Exhibit 2.  Petitioner did not raise any issue other than his termination in the November 15, 2019 demand letter. Petitioner appeared by counsel in connection with that arbitration on or about November 19, 2019, as set forth in Exhibit 3 to Pacifica's Cross-Petition. Subsequently, on May 27, 2020 Petitioner's attorney, without notifying Pacifica, asked the American Arbitration Association to assist in designating an arbitrator and to administer the proceeding. Pacifica is informed and believes, and thereupon alleges, that the submission made on or about May 15, 2020, was not Petitioner's demand for arbitration.

10.      The allegations of Paragraph 10 are admitted.

11.      The allegations of Paragraph 11 are admitted.

12.      Respondent denies the allegations of Paragraph 12 of the Petition in that the Award **denied** Petitioner relief on all claims related to his employment (he was found to have been terminated because he shut down a radio station owned by Respondent "in excess of his authority"), and not in violation of California's whistleblower statute. That Award did find that Petitioner was defamed in a radio program broadcast on December 20, 2019, subsequent to his termination, and awarded assumed damages based on a theory of defamation per se.

13.      The allegations of Paragraph 13 are admitted.

## AFFIRMATIVE DEFENSES

Respondent is informed and believes and based on such information and belief alleges the following separate and distinct affirmative defenses as to each any every request in the Petition:

**PACIFICA FOUNDATION, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD AND CROSS-PETITION TO VACATE ARBITRATION AWARD**

### FIRST AFFIRMATIVE DEFENSE

The Arbitrator lacked authority under the parties' arbitration agreement to address the issue of "defamation," since it did not "arise out of [Petitioner's] employment or the termination of his employment," and was not an issue reserved by the Parties for arbitration.

### SECOND AFFIRMATIVE DEFENSE

The Award, to the extent it addresses defamation, as discussed in the Counter-Petition, was generated because the Arbitrator allowed evidence of "defamation," a claim which had been abandoned and not addressed in any testimony during the hearing, or in any documentary evidence introduced during the hearing, to be submitted post-hearing, without any opportunity to address that evidence with testimony or evidentiary analysis.

### THIRD AFFIRMATIVE DEFENSE

The Arbitrator, as discussed in the Counter-Petition, exceeded her powers by issuing an award which waives the Respondent's unwaivable statutory rights and which contravenes an explicit legislative expression of public policy, to wit, Pacifica's right of free speech under the First Amendment to the US Constitution, and the California Constitution, and the protection of that right under California's anti-SLAPP laws, as expressed in the California Code of Civil Procedure Section 425.16.

### FOURTH AFFIRMATIVE DEFENSE

The Petition should be dismissed because the Agreement's mandatory forum selection provision requires the Petition to have been brought in California Superior Court.

**WHEREFORE**, Pacifica respectfully requests that the Court enter an Order:

1) denying the Petition to Confirm the Arbitration Award;

2) vacating the Arbitration Award; and

3) granting all other such relief as the Court deems just and proper.

**PACIFICA FOUNDATION, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD
AND CROSS-PETITION TO VACATE ARBITRATION AWARD**

## CROSS-PETITION TO VACATE ARBITRATION AWARD

As grounds for his Cross-Petition to Vacate Arbitration Award, Pacifica alleges as follows:

## THE PARTIES

1.     Pacifica is a California Nonprofit Public Benefit Corporation, with its main office located at 3729 Cahuenga Boulevard West, Los Angeles, California 91604.

2.     Pacifica is informed and believes, and thereupon alleges, that Petitioner/Cross-Respondent John C. Vernile is an adult individual who resides in New York.

## JURISDICTION AND VENUE

3.     Pursuant to the Agreement's mandatory forum selection provision, California Superior Court has exclusive jurisdiction over this matter.  (Petition, Ex. A, pg. 7.)

## FACTUAL BACKGROUND

4.     Pacifica was started by pacifists in 1946. In 1949, Pacifica's first radio station, KPFA, was established in Berkeley, California. Over the years it acquired four additional radio stations: (1) KPFK in Los Angeles, California, (2) KPFT in Houston, Texas, (1) WBAI in New York City, and (4) WPFW in Washington, D.C.

5.     Pacifica is run in accordance with its Bylaws and the California Corporation Code.

**I. The Corporations Code and Powers of the Directors and the Board.**

6.     Section 300 of the California Corporations Code states as follows:

> Subject to the provisions of this division and any limitations in the articles relating to action required to be approved by the shareholders (Section 153) or by the outstanding shares (Section 152), or by a less than majority vote of a class or series of preferred shares (Section 402.5), *the business and affairs of the corporation shall be managed and all corporate powers*

***shall be exercised by or under the direction of the board.*** The board may delegate the management of the day-to-day operation of the business of the corporation to a management company or other person provided that the business and affairs of the corporation shall be managed and all corporate powers shall be exercised under the ultimate direction of the board.

Cal. Corp. Code § 300(a) (emphasis added).

      7.    Section 5151, further provides (in pertinent part) that:

[d]uring an emergency, the board may take any action that it determines to be necessary or appropriate to respond to the emergency, mitigate the effects of the emergency, or comply with lawful federal and state government orders, but shall not take any action that requires the vote of the members, unless the required vote of the members was obtained prior to the emergency.

Cal. Corp. Code § 5151(g)(2).

      8.    Section 5140 states, in pertinent part:

In anticipation of or during an emergency, the board may take any action that it determines to be necessary or appropriate to respond to the emergency, mitigate the effects of the emergency, or comply with lawful federal and state government orders, but shall not take any action that requires the vote of the members, unless the required vote of the members was obtained prior to the emergency.

Cal. Corp. Code § 5140(n)(3).

**II. The Pacifica Bylaws.**

      9.    The relevant sections of the Pacifica Bylaws are as follows:

      a) Article Five, Board of Directors of the Foundation, Section 1: Board of Directors – Eligibility, Number, Powers and Duties

**PACIFICA FOUNDATION, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD AND CROSS-PETITION TO VACATE ARBITRATION AWARD**

## D.  GENERAL POWER AND AUTHORITY

Subject to the provisions of the California Nonprofit Public Benefit Corporation law, and any limitations in the Articles of Incorporation and these Bylaws relating to action required or permitted to be taken or approved by the Members or Delegates of the Foundation, the activities and affairs of the Foundation shall be conducted and ***all corporate powers shall be exercised by or under the direction of the Board.***

## E.  SPECIFIC POWERS AND DUTIES

Without prejudice to the general power of the Board set forth above in Section 1D of this Article of these Bylaws, and subject to any limitations set forth in these Bylaws, the ongoing duties and powers of the board shall include, but not be limited to:

(1) Ensuring and facilitating fulfillment of the purposes of the Foundation as set forth in the Articles of Incorporation;

(2) Ensuring compliance with applicable state and federal laws;

(3) Ensuring the financial health of the Foundation by adopting and monitoring an annual budget and overseeing an independent annual audit of the Foundation's books and accounts;

(4) Ensuring regular communication with the Members;

(5) ***Appointing, supervising and discharging the Foundation's Executive Director,*** Chief Financial Officer and all Foundation officers, ***prescribing powers and duties for them as are consistent with the law and these Bylaws***, and setting salaries and wages;

(6) ***Overseeing the conduct, management and control of the Foundation's affairs and activities,*** including the monitoring of the activities and actions of its radio stations and national staff consistent with applicable law and regulations, the Articles of Incorporation and these Bylaws;

b) Article Nine, Officers of the Foundation, Section 7: Executive Director

    A. The President of the Foundation shall be referred to as the "Executive Director." The Executive Director shall be the general manager, chief executive officer and chief administrator of the Foundation. ***S/he shall be selected, supervised and discharged by the Board***. In addition, his/her performance will also be subject to annual evaluation by each LSB, which may make recommendations to the Board.

    B. ***Subject to the control of the Board***, the Executive Director shall have general supervision, direction and control of the business and the officers of the Foundation and the primary responsibility for implementing the directives, decisions and policies of the Foundation and the Board pertaining to administration, personnel, programming, financing and public relations. The Executive Director shall generally promote, coordinate and supervise the mission of the Foundation and shall have such powers and perform such duties as may be delegated or assigned to him/her by the Board.

and

c) Article Seven, Local Station Board, Section 3: Specific Powers and Duties

    A. Each LSB, acting as a standing committee of the Foundation's Board of Directors, shall have the

following powers, duties and responsibilities related to its specific radio station, under the direction and supervision of the Foundation's Board of Directors:

B. To screen and select a pool of candidates for the position of General Manager of its respective radio station, *from which pool of approved candidates the Executive Director shall hire the station's General Manager*.

C. *Both the Executive Director and/or an LSB may initiate the process to fire a station General Manager*. However, to effectuate it, both the Executive Director and the LSB must agree to fire said General Manager. *If the Executive Director and the LSB cannot agree, the decision to terminate or retain said General Manager shall be made by the Board of Directors*.

10.     Petitioner was employed as the third Interim Executive Director of Pacifica and started working in that role beginning August 2019. He made it clear when he was hired that he needed to continue with other work on the outside that he would return to when his six-month role at Pacifica ended, and he purposefully had language to that effect inserted into his contract.

11.     Petitioner's employment contract with Pacifica included two documents, Plaintiff's Exhibit A (the Agreement") and Pacifica's Exhibit 1 (the employment offer letter executed by Petitioner). Both contained similar arbitration language. The relevant language reads: "[i]n the unlikely event of a dispute between Pacifica and Employee *arising out of Employee employment and termination of employment*: Pacifica and Employee agree to submit dispute to final and binding arbitration." (Petition, Ex. A, pg. 6; Cross-Petition, Ex. 1, pg. 2 (emphasis added).) This clause intentionally did not include disputes which did not "arise out of" Petitioner's employment or which arose after the termination of his employment.

/ / /

12.     As indicated above, Pacifica had been in existence since 1946. It expanded in around 1960 to include WBAI, a New York City station located at 99.5 on the FM dial. Periodically, over the years, either WBAI or one of the other stations (especially KPFK in Los Angeles) experienced financial problems, (i.e., expenses exceeded income). Pacifica is one corporation, not an amalgam of corporations, and excess expenditures at one station were, on occasion, covered by money in the internal account of another station. Pacifica's bookkeeping included accounts for each station, the Pacifica archives, and the Central Office, but, in the end, it was one entity. On several occasions discussed during the Arbitration hearing, stations had layoffs, approved by the Pacifica National Board: once at WBAI, in or around 2013; and once at KPFK, in or around 2015.

13.     Pacifica had a number of problems and disputes growing well before Petitioner was hired. When he arrived, it had not filed its audit for 2016, 2017, and 2018, with either the California Attorney General or the IRS as an attachment to its 990 Tax Return. Because of poor bookkeeping it had lost its funding from the Corporation for Public Broadcasting ("CPB"), a government entity, and owed CPB money. The California Attorney General in 2016 had threatened to revoke Pacifica's state tax-exempt status because at the time, its 2015 audit had not been completed and filed. That problem was resolved in 2016 when the 2015 audit was completed. Pacifica had a $4 million judgment against it for unpaid rent at the Empire State Building in New York, which was resolved through the procurement of a $3.7 million loan from an entity known as FJC in 2018.

14.     One persistent "solution" to Pacifica's financial problems was a proposal to sell WBAI's signal in New York City. Petitioner estimated in October 2019 that it was worth $50 million. Unsurprisingly, that "solution" was not popular with the staff or membership at WBAI.

15.     Pacifica's structure is extremely democratic for a nonprofit corporation of its size. Anyone who contributed $25 in any given year is a member of the station

they contribute to. Members of a station elect delegates to a Local Station Board ("LSB"). Each station's LSB is then responsible for electing four listener members and one "staff" member to serve on the National Board. This system allows each of the five stations to have equal representation on the National Board. The National Board also included two Directors from affiliate stations – stations which carry programming from Pacifica-owned stations in exchange for a small fee.

16. As illustrated above, the Pacifica Bylaws, as well as the Corporations Code, gave ultimate power to the National Board. The Bylaws expressly gave the Board power to hire and fire the Executive Director and the power to hire and fire a station General Manager if the Local Station Board and an Executive Director did not agree about whether to fire a General Manager.

17. This structure, where each station had an equal number of Directors, and where stations with better finances were covering costs for stations with financial issues, led to a fractious Board – a situation that, in the end, Petitioner drove to its extreme.

18. Among the group of Pacifica leaders who supported the sale of WBAI was Bill Crosier ("Crosier"), who served as Pacifica's Interim Executive Director in 2017. Not only did Crosier outline WBAI's sale as a possible solution, he was a proponent of taking Pacifica into bankruptcy so it could more easily sell its property. Simply stated, Crosier was a staunchly opposed to Pacifica's governance structure; on the day that he and Petitioner showed up at WBAI in New York City to fire the staff and take all local programming off the air, Crosier filed a lawsuit in Alameda County Superior Court asking a judge to impose a new set of Bylaws on Pacifica.

19. Crosier, who was Pacifica Board Secretary when Petitioner was hired, Grace Aaron, who was the Board Chair, and Sabrina Jacobs, who was Vice Chair, were set forth in Petitioner's contract as his "Transition Team." Neither the National

Board nor the Bylaws themselves gave this Transition Team authority to act in the stead of the Board.

20.     According to KPFA (the Berkely-Bay Area station) General Manager Quincy McCoy ("McCoy"), he met with Petitioner and Grace Aaron in Berkeley.[2] At that meeting, approximately two weeks into his term as Interim Executive Director, Petitioner announced that he wanted to create a Sirius XM station called Pacifica Across America, and that *he* had "underlined decided to run WBAI that way until it stabilized financially." Clearly, he had gone into his job with a plan—a plan which eight weeks later he implemented, without permission from the National Board or even discussing the proposal with the Board.

21.     On September 30, 2019, Petitioner issued an internal memo (dated September 25, 2019) warning that the financial situation of WBAI was so bad that Pacifica was on the verge of imminent collapse.[3] Not once in that memo did Petitioner talk about firing the WBAI General Manager (something he had no power to do himself), about firing staff, or about implementing his Pacifica Across America solution, thereby replacing all local programming in New York.

22.     During the Arbitration hearing, which will be discussed in greater detail below, documents showed that Petitioner discussed his plans for WBAI with Pacifica's General Counsel, Ford Greene ("Greene"), who advised Petitioner that it was imperative, under the law, that he get the National Board to approve his WBAI plan. Greene added that at minimum, he should at least poll the Board to ascertain its support – despite the Bylaws having no provision for polling the Board.

---

[2] Noteworthy, McCoy testified at the Arbitration hearing that KPFA had never been asked to transfer money to benefit WBAI but had done so for KPFK payroll needs.
[3] In fact, as it turned out, even when Petitioner cut off on-air fundraising at WBAI between October 7 and November 8, 2019, WBAI met all of its payroll obligations during that period.  Contrary to Petitioner's beliefs, Pacifica did not collapse – not even during the Pandemic.

23.     Petitioner had Crosier poll the Board – but only the members that he thought would be supportive of Petitioner's plans.  Instead of sending out a proposal to the entire membership of the National Board for discussion, Crosier sent e-mails to one or two Board members at a time, requesting their support. Although Crosier never received approval by the National Board's majority, he and Petitioner decided to nonetheless march forward with the plan to shut down local programming at WBAI and fire[4] its entire staff.

24.     On October 7, 2019, the same day that Crosier filed an *ex parte* injunction request with Alameda County Superior Court to restructure Pacifica's governance, he and Petitioner, and a few others, showed up in New York to shut WBAI down.  All but one member of the staff (Linda Perry) was asked to leave. The program feed was changed to Pacifica Across America, the General Manager and all paid staff were "terminated," the union was told that all union staff were "terminated," and all volunteer staff (about 150 producers) were told that they too were being fired.

25.     That evening the WBAI LSB Chair, and a number of members, filed suit and were able to have an emergency motion for a temporary restraining order ("TRO") heard by New York State Supreme Court Judge Frank Nervo. The TRO was granted, directing that all staff be put back on payroll and that WBAI be put back on the air, and its studio returned to the NYC staff.  On October 10, 2019, the New York Appellate Division modified the TRO and required only that the staff be kept on payroll.

26.     Given New York's overwhelming community support for Pacifica and WBAI, Petitioner's action prompted a reaction in the press. The New York Mayor, Bill de Blasio, tweeted about the loss of the station, and Brooklyn Borough

---

[4] Not lay off.

**PACIFICA FOUNDATION, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD AND CROSS-PETITION TO VACATE ARBITRATION AWARD**

President Eric Adams (now New York's active Mayor) led a rally on the steps of City Hall denouncing Petitioner's actions.

27.   A month of full-scale litigation in the New York court system followed.  Eventually the case was assigned to New York State Supreme Court Justice Melissa Crane, who, on November 6, 2019, issued a Preliminary Injunction ordering Pacifica to restore WBAI to the status it held before October 7, 2019. A true and correct copy of Judge Crane's order and the transcript from the November 6, 2020 hearing is attached hereto as Exhibit 4.

28.   While the New York litigation was pending, the Pacifica National Board held a series of meetings. One of them was a Special Meeting conducted on October 20, 2019. A majority of the Board attended, and they again voted, ***unanimously***, to order Petitioner to reverse what he had done at WBAI, and to restore local control over WBAI's programing.  It also voted to suspend Petitioner. See Cross-Petition, Ex. 5, pg. 10.  Petitioner ignored this express direction from the National Board, continued to hold himself out as Pacifica's Interim Executive Director, and continued to air Pacifica Across America on WBAI.[5]

29.   In her November 7, 2019 ruling, Judge Crane found that the October 20, 2019 Board meeting was properly called. Given the vote from the November 7th Board meeting, Judge Crane reinstated the original TRO, issued October 7, 2019, requiring local control over programming, reinstatement of all employees and staff, and non-interference with WBAI's operations by Pacifica. The station went back on the air the next day.

30.   The National Board, at its following meeting on November 14, 2019, voted to terminate Petitioner's employment.

---

[5] Contrary to Pacifica's Bylaws and Petitioner's employment Agreement, Petitioner believed that the National Board reported to and took direction ***from him*** – not the other way around.  Petitioner's continued insolence is what ultimately led to his termination.

31.     On November 15, 2019, Petitioner demanded arbitration. A true and correct copy of Petitioner's November 15, 2019 demand for arbitration is attached hereto as Exhibit 2. It reads, in relevant part, "I am protesting my termination as being in violation of the terms of my employment agreement and in violation of federal and California state laws. Pursuant to the terms of my employment contract I am invoking/requesting arbitration with the American Arbitration Association in the state of California." See Ex. 2.

32.     On November 16, 2019, the Acting Chair of the Pacifica Board, Lawrence Reyes, sent an Amended Notice of Termination to Petitioner, which stated:

> On November 14, 2019, at a duly constituted meeting of the Pacifica National Board, a determination was made to terminate your employment as Interim Executive Director, for cause.
>
> The grounds include, but are not limited to, willful disregard of Pacifica policies and procedures, deliberate refusal to follow the instructions of the PNB, and an effort to undermine the democratic processes of Pacifica. The charges arise out of your actions in connection with WBAI between the dates of October 7, 2019 and November 7, 2019, and the conduct of LSB elections in October 2019. The Board, during that period, repeatedly adopted resolutions asserting that your actions involving WBAI were inappropriate, and directed that they be reversed. You did not follow those instructions until you were ordered to do so by NY Supreme Court Justice Melissa Crane on November 6, 2019. You took your actions without consulting the PNB, and did so in the midst of a WBAI Fund Drive, causing Pacifica to lose hundreds of thousands of dollars. In addition, you sought, unsuccessfully, to prevent the election apparatus of Pacifica from completing LSB elections in October and November 2019.

/ / /

/ / /

**PACIFICA FOUNDATION, INC.'S RESPONSE TO PETITION TO CONFIRM ARBITRATION AWARD AND CROSS-PETITION TO VACATE ARBITRATION AWARD**

33.     On November 19, 2019 an attorney, Arthur Lazear, advised that he was appearing in litigation concerning Petitioner Vernile's "employment."

34.     Pacifica heard nothing more until May 15 2020, when Lazear, *ex parte*, filed an "Arbitration Demand" with the American Arbitration Association ("AAA") asking to begin the arbitrator selection process. He did not serve a copy on Pacifica, which learned of the filing more than a month later.

**III.     The Arbitration of Petitioner's Wrongful Termination Claims.**

35.     On September 11, 2020 Diane Welch ("Arbitrator Welch") was appointed by AAA to act as the arbitrator in the parties' employment dispute.

36.     On June 28, 2021, Arbitrator Welch issued a scheduling order setting a hearing for December 13-17, 2021, and requiring pre-hearing briefs to be filed by December 2, 2021.

37.     Petitioner's attorney submitted his Pre-Hearing Brief on December 2, 2021.  A true and correct copy of Petitioner's Pre-Hearing Brief is attached hereto as Exhibit 6.  At no point in the 22-page brief did Petitioner's counsel mention the word "defamation."   In its conclusion Petitioner only asked for "damages he suffered from his wrongful termination."  There was no request for or reference to damages from any purported defamation.

38.     The Arbitration hearing was held December 13-17, 2021, and continued to January 12 and 25, 2022. At no point during the lengthy Arbitration hearing was any testimony or documentary evidence admitted into evidence to prove Petitioner's defamation claim.  As a consequence, Pacifica had no obligation to call its own witnesses or introduce any evidence to refute a defamation claim that had not been presented by Petitioner.

39.     At the conclusion of the hearing, Arbitrator Welch asked the parties whether they wanted to add any documentary evidence that had not been introduced through witnesses at the hearing. Petitioner's attorney, recognizing that the Arbitration process was not going in Petitioner's favor, listed 9 audio files with

multiple recordings made as late as December 2020.  Pacifica, through counsel, objected, especially after Petitioner's counsel stated that the recordings were being submitted to "prove defamation."  A true and correct copy of Pacifica's memo to Arbitrator Welch's outlining Pacifica's objections is attached hereto as Exhibit 7. Pacifica had no opportunity to address the alleged defamation through witnesses, or examine Petitioner or his own witnesses about the statements themselves, the elements Petitioner needed to establish in order to prove his defamation claim or Pacifica's affirmative defenses thereto.

40.    Arbitrator Welch nonetheless allowed the tapes into evidence, requiring Petitioner to "identify which statements he alleges were defamatory and identify the specific recording and time stamp of the alleged defamatory statement." Her only concession to Pacifica was to allow a rebuttal brief but did not otherwise provide Pacifica the opportunity to present evidence in response to Petitioner's defamation claim that was shoehorned into the Arbitration process after the close of evidence.

41.    Again, Pacifica strenuously objected to the patently unfair process adopted by Arbitrator Welch.  See Ex. 8.  Pacifica's counsel pointed out that Arbitrator Welch's refusal to reopen the hearing and allow Petitioner and Pacifica to present evidence on the defamation claim would result in extreme prejudice to Pacifica and jeopardize the entire Arbitration process.  Id.

42.    As Pacifica feared, Petitioner's defamation claim was presented in the broadest of strokes. Counsel provided a link to the middle of some broadcasts, all of which post-dated Petitioner's termination and Arbitration demand, and (Pacifica has to assume) invited the Arbitrator to listen to everything which followed. There was not even an effort to give a segment notation, such as "between 1:02:45 and 1:04:02," which would ask the Arbitrator to listen to a 1 minute and 17 second segment.  There was no specific quote or statement which the Arbitrator was directed to look for. There was no indication as to who was speaking on the

recordings (or whether they were speaking on behalf of Pacifica) or who was offering the statement (which, as discussed below, is in all instances a statement of opinion on a matter of general public interest). Petitioner's submission after the Arbitration hearing amounted to simply an invitation to the Arbitrator to listen to approximately 14 hours of recordings and find a "defamatory statement" herself.

43.    In the Arbitration Award, which Petitioner seeks to confirm, Arbitrator Welch found that Petitioner's failed to prove his claims for either wrongful termination or whistleblower retaliation.  More specifically, Arbitrator Welch held that Pacifica had "met its burden of establishing by clear and convincing evidence that it terminated [Petitioner]'s employment because the PNB believed that he had exceeded his authority by discharging WBAI staff and shutting down its programming without full PNB approval, and that further, that he exceeded his authority by not reversing that decision until ordered to do so by Justice Crane." (Petition, Ex. C, pg. 30-31.)  Pacifica does not contest this portion of Arbitrator Welch's findings.

44.    However, Arbitrator Welch then turned to Petitioner's defamation claim. She found that in a December 20, 2019 broadcast – over a month after Petitioner's termination and his corresponding demand for arbitration – Linda Perry, WBAI's program director "broadcast that [Petitioner] was hired to carry out a plan to sell WBAI for 'millions and millions of dollars to benefit other stations' and that he was part of a 'rogue group' who had staged a 'coup.'" (Petition, Ex. C, pg. 34-35.)  Arbitrator Welch continued that "Perry stated that the plan had been 'in the works for a long time,' to dump WBAI." (Id.)  The Arbitrator then found that the statements were "demonstrably false." Arbitrator Welch appeared incredibly offended by the word "coup" even though she specifically found that Petitioner acted in excess of his authority and that although Petitioner and the others who closed WBAI and fired its staff on October 7, 2019 "did not represent the majority of the PNB, they did represent a ***significant minority***." (Id. at pg. 36.)  Arbitrator

Welch even found that it was "defamatory" to state that Petitioner was discussing the sale of WBAI, even though the record contained an e-mail from Petitioner on the very subject, sent during the period of time he had taken local WBAI programming off the air.  (See Ex. 9.)

45.    Setting aside the due process and fairness concerns discussed in greater detail below, Arbitrator Welch's findings that the use of the words "rogue group" and "coup" was demonstrably false and that individuals falsely stated that Petitioner was discussing the sale of WBAI, were inconsistent with the evidence actually presented during the hearing and the remainder of Arbitrator Welch's own findings.

46.    Arbitrator Welch additionally found that although Petitioner was a "limited-purpose public figure," and thus had to prove by "clear and convincing evidence" that *Pacifica* acted with reckless disregard for the statements' truth or falsity, Petitioner had satisfied this steep burden without offering one word of testimony. (Petition, Ex. C, pg. 37.) Arbitrator Welch held that Petitioner showed "by clear and convincing evidence that Perry, along with other supporters of WBAI…were colossally hostile towards [Petitioner]," proved by the assertion that "[Petitioner] was denounced in public [by an unnamed person] and called 'vermin,' 'rat,' and 'crook.'" (Id.)  And that in "this environment, it is no wonder that Perry [and others] did not investigate claims they made on air to determine their truth or falsity."

47.    Arbitrator Welch found that the recordings presented after the Arbitration hearing contained statements that were defamatory per se. Consequently, she held that "damage to Vernile's reputation is conclusively presumed" and that "[p]roof of actual damages is not required."  (Id. at pg. 38.) Arbitrator Welch concluded by rhetorically asking "who would want to hire someone who acted as a 'rogue' and 'staged a coup.'"  Perry's sue of the words "coup" and "rogue," Arbitrator Welch held (as opposed to the lawful firing), caused Petitioner Vernile $300,000 in *assumed* damages.

## THE ARBITRATION AWARD SHOULD BE VACATED

### I.   INTRODUCTION.

Pacifica requests that the Court vacate the Arbitration Award pursuant to the Federal Arbitration Act the California Arbitration Act.

### II. LEGAL STANDARD FOR VACATING ARBITRATION AWARDS.

48.     Section 10 of the Federal Arbitration Act (the "FAA" or the "Act"), to the extent it is even applicable given the Agreement's mandatory California forum-selection and choice-of-law provisions (Petition, Ex. A, pg. 7), provides that arbitration awards may be vacated on the following grounds:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4).    The Arbitration Award at issue, to the extent that it addressed Petitioner's "defamation" claim, should be vacated under sections 10(a)(3) and (4).

49.     Similarly, a trial court may vacate an arbitration award under California Code of Civil Procedure section 1286.2.  Section 1286.2(a) allows a trial court to vacate an arbitration award if it determines: the rights of a party were substantially prejudiced by misconduct of a neutral arbitrator (§ 1286.2(a)(3)); the arbitrator exceeded his or her powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted (§ 1286.2(4));

or, the rights of a party were substantially prejudiced by the refusal of the arbitrator to postpone the hearing upon sufficient cause being shown or by the refusal of the arbitrator to hear evidence material to the controversy (§ 1286.2(a)(5)).

### III.     THE ARBITRATION AWARD MUST BE VACATED.

50.     **As discussed in greater detail below, Arbitrator Welch exceeded her authority.** Though the Agreement's arbitration provision only applied to disputes between Pacifica and Petitioner arising out of Petitioner's employment and termination of employment, Arbitrator Welch entertained evidence and issued an award based on alleged defamation that took place *after* Petitioner's termination.

51.     **In addition, Arbitrator Welch committed misconduct and injected unfairness into the arbitration proceeding by allowing Petitioner – *after the arbitration hearing had ended* – to submit evidence at the eleventh hour relating to alleged defamatory statements that were never discussed in Petitioner's pre-arbitration demand or pre-hearing brief**. As a result of the Arbitrator's decision, Pacifica was prejudiced in multiple ways.

52.     First, by considering the defamation claim in the context of an ad hoc, post-arbitration hearing proceeding after all law and motion matters had already been briefed and ruled on, Pacifica was precluded from vindicating its free speech rights under California's anti-SLAPP statute.

53.     Second, Arbitrator Welch's process for making substantive findings on Petitioner's defamation claim was unfair because his claim was not (1) included in Petitioner's initial demand for arbitration, which laid out the claims Petitioner sought to arbitrate; (2) discussed in Petitioner's pre-hearing brief, which framed the issues to be tried through the arbitration process (thereby essentially waiving this claim); and (3) addressed through witnesses during the hearing or documents introduced during the hearing.

///

///

54. Third, Arbitrator Welch acted improperly by not permitting the record to be reopened once she ruled that the audio files could be introduced to "prove' defamation after the testimony had closed.

55. Finally, Arbitrator Welch exhibited a manifest disregard for the law by issuing an award based on defamation *per se* without first finding that the speaker actually had a high degree of awareness of probable falsity.

**A. Arbitrator Welch Exceed Her Powers By Considering a Defamation Claim that Fell Outside the Scope of the Arbitration Agreement.**

56. Under both California Law and the FAA, arbitrators may not issue an unauthorized remedy or grant an award on an unsubmitted issue. 9 U.S.C. § 10(a)(3); <u>see also</u> Cal. Code of Civ. P. § 1286.2(4). The California Supreme Court has delineated the standard for measuring the scope of the arbitrator's authority in <u>Advanced Micro Devices, Inc. v. Intel Corp.</u> In that case the California Supreme Court confirmed that "the deference due an arbitrator's decision on the merits of the controversy requires a court to refrain from substituting its judgment for the arbitrator's in determining the contractual scope of those powers." <u>Advanced Micro Devices, Inc. v. Intel Corp.</u>, 9 Cal. 4th 362, 372 (1994). The court noted, however, "that the deference accorded an arbitrator's decision under the arbitration agreement is not unrestricted, and indeed, *is limited by the agreement to arbitrate*" and recognized that courts "retain the authority to overturn arbitration awards as beyond the arbitrator's powers, whether for an unauthorized remedy or decision on an *unsubmitted issue*." <u>Id.</u> at 375.

57. Additionally, "Arbitrators may exceed their powers by issuing an award that violates a party's unwaivable statutory rights or that contravenes an explicit legislative expression of public policy." <u>Richey v. AutoNation, Inc.</u>, 60 Cal. 4th 909, 916 (2015); see also <u>Board of Education v. Round Valley Teachers Assn.</u>, 13 Cal. 4th 269, 272-277 (1996) (holding that arbitrator exceeded powers by giving

effect to collective bargaining provisions that violated statutory rights in the California Education Code); see also California Dept. of Human Resources v. Service Employees Internat. Union, Local 1000, 209 Cal.App.4th 1420 (2012) (holding that arbitrator lacked power to make an award that violated explicit public policy favoring legislative oversight of state employee contracts when he interpreted a memorandum of understanding between union and state to require salary increases the Legislature did not approve).

58.    In light of these principles, it is evident that an arbitration agreement cannot be made to serve as a vehicle for the waiver of statutory or Constitutional rights.  Armendariz v. Foundation Health Psychcare Services, Inc., 24 Cal. 4th 83, 100–101 (2000).

59.    Here, Arbitrator Welch considered an issue outside the scope of the Agreement's arbitration provision and deprived Pacifica of statutory and Constitutional protections.  Namely, the arbitration clause here limited the claims which were subject to arbitration to those claims *arising out of Employee employment and termination of employment*. (Petition, Ex. A, pg. 6; Cross-Petition, Ex. 1, pg. 2 (emphasis added).)  Despite this limitation, Arbitrator Welch considered a defamation claim involving activity that took place *after* Petitioner was terminated.  Additionally, this claim was not addressed in pre-hearing briefs or in testimony before the arbitrator.  Based on the forging, Arbitrator Welch lacked the authority to render a substantive finding of defamation *per se* and, consequently, the Arbitration Award should be vacated.

**B. Arbitrator Welch's Procedures as to the Defamation Claim Resulted in an Inherently Unfair Arbitration.**

60.    The Legislature has authorized "judicial review in circumstances involving serious problems with the award itself, or with the fairness of the arbitration process." Moncharsh v. Heily & Blase, 3 Cal. 4th 1, 8-13 (1992); see also Cal. Code of Civ. P. § 1286.2(a); see also 9 U.S.C. § 10(a)(3).  "[T]o hold that

a district court may not review any procedural rulings of the arbitration panel…would result in judicial abdication in reviewing arbitration awards. Although the Arbitration Act and the California Code of Civil Procedure requires restraint in reviewing arbitration awards, it does not call for total abdication of reviewing power." Newark Morning Ledger Co. v. Newark Typographical Union Local 103, 797 F. 2d 162, 165–66 n. 3 (3d Cir.1986) (quoting Summers, *Judicial Review of Labor Arbitration,* 2 Buffalo L.Rev. 1, 21–22, 24 (1952)). "Thus, a district court may consider procedural irregularities insofar as they rise to the level of requiring vacatur or modification of the award pursuant to sections 10 and 11 of the Arbitration Act. To hold otherwise would not serve the purposes of the Act." Carte Blanche (Singapore) Pte. Ltd. v. Carte Blanche Intern., Ltd., 683 F. Supp. 945, 956 (S.D.N.Y. 1988).

> 1) <u>By allowing the Petitioner to litigate the defamation claim at the eleventh hour, Pacifica was denied the opportunity to present counter-evidence.</u>

Assuming, *arguendo*, that Arbitrator Welch did not exceed her authority, and the Arbitration provision in the Agreement, by considering Petitioner's defamation claim, the process she implemented to do so violated Pacifica's due process rights and was patently unfair.  As indicated above, Arbitrator Welch admitted 14 hours of audio tape into evidence – after the close of evidence and over the objection of Pacifica.  Only permitting Pacifica to submit legal argument in a reply brief, without the opportunity to present evidence in response to Petitioner's defamation claim, was prejudicial to Pacifica.  It was imperative that Arbitrator Welch reopen the record for testimony about the statements contained within the recordings and allow Pacifica the opportunity to explore the "defamatory" statements, many of which Arbitrator Welch ultimately concluded were unactionable opinion, as the right to fundamental due process would have required.

/ / /

/ / /

2) <u>By allowing the petitioner to litigate the defamation claim at the eleventh hours, after law and motion practice had ended, Pacifica was denied the opportunity to utilize the protections of California's anti-SLAPP statute.</u>

*a. California's anti-SLAPP Statute Standard.*

61.     The right to free speech is an inviolable right set forth in the US and California Constitutions. In California, and many other states, "anti-SLAPP" statutes have been enacted to not only to protect speech, but to penalize those who use litigation to attack the exercise of free speech, particularly speech on a matter of public intertest express in the media.

62.     In California, "[T]he only thing the defendant needs to establish to invoke the [potential] protection of the SLAPP statute is that the challenged lawsuit arose from an act on the part of the defendant in furtherance of her right of petition or free speech. From that fact the court may [effectively] presume the purpose of the action was to chill the defendant's exercise of First Amendment rights." <u>Equilon Enterprises v. Consumer Cause, Inc.</u>, 29 Cal. 4th 53, 61 (2002); <u>see</u> <u>also</u> Cal. Code of Civ. P. § 425.16.

63.     California Code of Civil Procedure section 425.16 provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Code of Civ. P. § 425.16(b)(1).

64.     The purpose of the statute is to encourage participation in matters of public significance by allowing a court to promptly dismiss unmeritorious actions or claims brought to chill another's valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. <u>See</u> Cal. Code of Civ. P. § 425.16(a).

65.     The California anti-SLAPP law allows a defendant to file a motion to strike the complaint, which the court will hear within 30 days unless the docket is overbooked. Cal. Civ. Proc. Code § 425.16(f). Discovery activities are placed on hold from the time the motion is filed until the court has ruled on it, although the judge may permit "specified discovery" if the requesting party provides notice of its request to the other side and can show good cause for it. Cal. Code of Civ. P. § 425.16(g).  Thus, section 425.16 provides an expedited mechanism for addressing defamation claims at the beginning of a lawsuit so that claims involving protected speech may be stricken without the need for unnecessary litigation and discovery.

66.     Court's implement a two-step process for determining whether a claim is subject to being stricken under the anti-SLAPP statute. In the first step, the defendant bringing an anti-SLAPP motion must make a *prima facie* showing that the plaintiff's suit is subject to section 425.16 by showing the defendant's challenged acts were taken in furtherance of his or her constitutional rights of petition or free speech in connection with a public issue, as defined by the statute. Jarrow Formulas, Inc. v. LaMarche, 31 Cal. 4th 728, 733 (2003).

67.     After the defendant satisfies the first step, the burden shifts to the plaintiff to demonstrate there is a reasonable probability he or she will prevail on the merits at trial.  Cal. Code of Civ. P. § 425.16(b)(1).  In this phase, the plaintiff must show both that the claim is legally sufficient and there is admissible evidence that, if credited, would be sufficient to sustain a favorable judgment Wilcox v. Superior Court, 27 Cal.App.4th 809, 823 (1994), disapproved on other grounds in Equilon Enterprises, supra, 29 Cal.4th at 68 n. 5.  In making this assessment, the court must consider both the legal sufficiency of and evidentiary support for the pleaded claims, and must also examine whether there are any constitutional or nonconstitutional defenses to the pleaded claims and, if so, whether there is evidence to negate any such defenses. Traditional Cat Assn., Inc. v. Gilbreath, 118 Cal.App.4th 392, 398–399 (2004).

68.     In considering whether a plaintiff has met those evidentiary burdens, the court must consider the pleadings and the evidence submitted by the parties. Cal. Code of Civ. P. § 425.16(b)(1)-(2).   The court cannot weigh the evidence (Looney v. Superior Court, 16 Cal.App.4th 521, 537–538 (1993)), but instead must simply determine whether the plaintiff's evidence would, if credited, be sufficient to meet the burden of proof. Wilcox, supra, 27 Cal.App.4th at 823–825 (standard for assessing evidence is analogous to standard applicable to motions for nonsuit or directed verdict.).

69.     In Hecimovich v. Encinal School Parent Teacher Organization, 203 Cal.App.4th 450 (2012), the court held when deciding whether the anti-SLAPP statute applies to a defamation claim, an "issue of public interest must be construed broadly."   Because Petitioner's defamation claim relied entirely on statements broadcast on a radio station about an issue of public concern, California's     anti-SLAPP law needed (and here needs to be) considered.

70.     The California anti-SLAPP law allows a defendant to file a motion to strike the complaint, which the court will hear within 30 days unless the docket is overbooked. Cal. Civ. Proc. Code § 425.16(f). Discovery activities are placed on hold from the time the motion is filed until the court has ruled on it, although the judge may permit "specified discovery" if the requesting party provides notice of its request to the other side and can show good cause for it. § 425.16(g).

*b. Pacifica was not afforded the protections of 425.16.*

71.     Here, because of the timing of Petitioner's submission of his defamation claim, and the patently unfair arbitration process implemented by Arbitrator Welch for considering the claim, Pacifica was denied the opportunity to utilize the protections of California's anti-SLAPP statute.

72.     Specifically, Petitioner submitted to Arbitrator Welch 14 hours of radio broadcasts that contained discussions of what had occurred at WBAI.   In the broadcasts, hosts and guests (including Eric Adams, now the Mayor of NYC)

discussed the events surrounding WBAI in October 2019, and expressed their views, arguments and opinions. Petitioner invited the Arbitrator to parse those recordings, for expressions of opinion which he characterized as inaccurate, and asked for damages. Petitioner did not present testimony, explain why they the statements were inaccurate, that the statements were made on behalf of Pacifica, or even describe the context in which the statements were made.

73.    Even if Respondent Pacifica had any idea what Petitioner was going to engineer after the close of testimony, it could still not utilize the protections of California's anti-SLAPP process in the contest of the arbitration.   Had Pacifica had the opportunity to pursue anti-SLAPP relief, it had a strong likelihood of success.

74.    Petitioner's late asserted defamation claim, to the extent it could be made out from the audio files, involved an issue of public interest. There was no testimony, from either side, which would allow a proper assessment of Constitutional malice – Petitioner was a public figure. Not only was there no testimony about what statements were being targeted, there was also no context, no who said what, and no explanation for why Pacifica should be liable for what people said at on a radio show.

## C. The Arbitration Award Was Made in Manifest Disregard of the Law.

75.    Under the FAA, absent circumstances indicating that the arbitration process was tainted by fraud, corruption, or arbitrator misconduct, a federal court may also vacate arbitration awards "made 'in manifest disregard of the law.'" Merrill Lynch, Pierce, Fenner & Smith v. Jaros, 70 F. 3d 418, 421 (6th Cir. 195) (quoting Wilko v. Swan, 346 U.S. 427 (1953))."  A mere error in interpretation or application of the law is insufficient. Id.; see also Siegel v. Titan Indus. Corp., 779 F. 2d 891, 892–93 (2d Cir. 1985); I/S Stavborg v. National Metal Converters, Inc., 500 F. 2d 424, 432 (2d Cir. 1974). An arbitration panel acts in manifest disregard of the law if the applicable legal principle is clear and well

settled and it refuses to follow that legal principle. <u>Glennon v. Dean Witter</u> <u>Reynolds, Inc.</u>, 83 F. 3d 132, 136 (6th Cir. 1996); <u>see also</u> <u>Wilko v. Swan</u>, 346 U.S. 427, 436–37 (1953).

76. The <u>Glennon</u> case contains a telling description of how this perspective is applied. In <u>Glennon</u>, the Sixth Circuit was reviewing the defendant's challenge to an arbitration panel's punitive damage award. The court noted that:

> In this case, defendant does not argue that if there is *any* evidence to support the compensatory damage award or if there is *any* evidence to support a finding of malice, that the punitive damage award is excessive. Rather, defendant argues that because the record contains *no* evidence to support an award of compensatory damages and *no* evidence of "intentional, fraudulent, malicious, or reckless conduct," there is no basis for an award of punitive damages.

<u>Glennon</u>, at 138-139. The court concluded that:

> For purposes of this discussion we assume without deciding that due process protections attach in this case, and therefore, proceed to consider whether the FAA affords meaningful review to defendant's claim that *no* evidence supports the arbitration panel's punitive damage award. We conclude that the manifest disregard of the law standard permits vacatur of those punitive damage awards that are supported by *no* evidence. Since that standard of review would allow vacatur of those awards, it is necessarily meaningful review of claims that *no* evidence supports an arbitration panel's punitive damage award.

<u>Id.</u>

### 1) No evidence was presented to support a $300,000 award.

77. There was ***no evidence*** supporting the award of $300,000. Arbitrator Welch made a finding of defamation *per se* so that Petitioner would not be required to present evidence of actual damages. Given the Arbitration Award, it appears that Arbitrator Welch picked the $300,000 figure out of the air, similar to the way she made the finding of "actual malice" simply because Linda Perry ***sounded angry***.

Based on the forgoing, even if Arbitrator Welch had the authority to make a finding on Petitioner's defamation claim, the process she implemented was so patently unfair such that the interests of justice mandate vacating the Arbitration Award.

2) <u>No evidence was presented showing malice.</u>

78. A claim for defamation requires proof of a false and unprivileged publication that exposes the plaintiff "to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Cal. Civ. Code § 45.

79. "The sine qua non of recovery for defamation … is the existence of falsehood." <u>Letter Carriers v. Austin</u>, 418 U.S. 264, 283 (1974). Because the statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability. Although statements of fact may be actionable as libel, statements of opinion are constitutionally protected. <u>Baker v. Los Angeles Herald Examiner</u>, 42 Cal.3d 254, 260 (1986).

80. A statement is defamatory when it tends "directly to injure [a person] in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, trade, profession, or business that has a natural tendency to lessen its profits[.]" Cal. Civ. Code § 46(3).

81. Statements that contain such a charge directly, and without the need for explanatory matter, are libelous *per se*. Cal. Civ. Code § 45a. A statement can also be libelous *per se* if it contains a charge by implication from the language employed by the speaker and a listener could understand the defamatory meaning without the necessity of knowing extrinsic explanatory matter. <u>MacLeod v. Tribune Publishing Co.</u>, 52 Cal. 2d 536, 548–550 (1959). However, if the listener would not recognize the defamatory meaning without "knowledge of specific facts and circumstances,

extrinsic to the publication, which are not matters of common knowledge rationally attributable to all reasonable persons," the matter is deemed defamatory *per quod* and requires pleading and proof of special damages.   Barnes–Hind v. Superior Court, 181 Cal.App.3d 377, 387 (1986).

82.     A threshold determination in a defamation action is whether the plaintiff is a "public figure." The courts have defined two classes of public figures. "The first is the 'all purpose' public figure who has 'achiev[ed] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts.'" Reader's Digest Assn. v. Superior Court, 37 Cal. 3d 244, 253–254 (1984) (citing Gertz v. Robert Welch, Inc. 418 U.S. 323, 351 (1974)).  "The second category is that of the 'limited purpose' or 'vortex' public figure, an individual who 'voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.'" Id.  The California Supreme Court went on to state that "unlike the 'all purpose' public figure, the 'limited purpose' public figure loses certain protection for his [or her] reputation only to the extent that the allegedly defamatory communication relates to his role [or her] in a public controversy." Id.

83.     When the plaintiff is a public figure, he or she may not recover defamation damages merely by showing the defamatory statement was false. Instead, the plaintiff must also show the speaker made the objectionable statement with malice in its constitutional sense, "that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Reader's Digest Assn., 37 Cal. 3d at 256.

84.     The test is "a subjective test, under which the defendant's actual belief concerning the truthfulness of the publication is the crucial issue."   Reader's Digest Assn., 37 Cal. 3d at 257.  "This test directs attention to the 'defendant's attitude toward the truth or falsity of the material published…[not] the defendant's attitude

toward the plaintiff.'" <u>Reader's Digest Assn.</u>, 37 Cal. 3d at 257 (quoting <u>Widener</u> <u>v. Pacific Gas & Electric Co.</u>, 75 Cal.App.3d 415, 434 (1977)).

85.    The reckless disregard test is not a negligence test measured by whether a reasonably prudent person would have published, or would have investigated before publishing, the defamatory statement. <u>St. Amant v. Thompson</u>, 390 U.S. 727, 731 (1968).  Instead, the evidence must "permit the conclusion that the defendant actually had a 'high degree of awareness of…probable falsity.'" <u>Harte–Hanks Communications v. Connaughton</u>, 491 U.S. 657, 688 (1989) (internal citations omitted).  "As a result, failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." <u>Id.</u>

86.    Instead, to support a finding of actual malice, the failure to investigate must fairly be characterized as demonstrating the speaker purposefully avoided the truth or deliberately decided not to acquire knowledge of facts that might confirm the probable falsity of charges. <u>Antonovich v. Superior Court</u>, 234 Cal.App.3d 1041, 1049 (1991).  The requisite malice must be shown by clear and convincing evidence. This standard requires that the evidence of actual knowledge of the falsity or reckless disregard for its falsity must be of such a character "as to command the unhesitating assent of every reasonable mind." <u>Rosenaur v. Scherer</u>, 88 Cal.App.4th 260, 274 (2001).

87.    Here, Arbitrator Welch ultimately found that Petitioner's actions at WBAI to be "in excess of his authority," but his efforts to further the views of a significant minority on the Pacifica Board, did not amount to a "coup." Arbitrator Welch didn't see the word "coup" as an expression of opinion, but one of fact, and she found the actual malice required by State and Federal Law to have been established simply because the speaker was "angry."  Such a finding was made in manifest disregard for the law and necessitates vacating the Arbitration Award.

/ / /

## **CONCLUSION AND PRAYER FOR RELIEF**

Respondent/Cross-Petitioner Pacifica Foundation, Inc. respectfully requests that this Court deny the Petition to Confirm Arbitration Award, grant Respondent's Cross-Petition to Vacate Arbitration Award, and award Respondent such other and further relief as this Court may deem proper.


Dated:  May 20, 2022                                    **FOR PURPOSE LAW GROUP**


                                                       By:___/s/ Matthew B. Learned_____
                                                           Matthew B. Learned, Esq.
                                                           Attorney for Respondent,
                                                           Pacifica Foundation Inc.

Dated:  May 20, 2022                                    **ADVOCATES FOR JUSTICE,**
                                                       **CHARTERED ATTORNEYS**


                                                       By:___/s/ Arthur Z. Schwartz_____
                                                           Arthur Z. Schwartz, Esq.
                                                           Proposed Attorney for Respondent,
                                                           Pacifica Foundation Inc., *Pro Hac Vice*