**FOR PURPOSE LAW GROUP**
May L. Harris, Esq. (Cal. SBN 211210)
Matthew B. Learned, Esq. (Cal. SBN 255499)
408 Nutmeg St.
San Diego, CA 92103
Tel: (619) 780-3839
Fax: (619) 780-2451
Email: mlearned@forpurposelaw.com

Attorneys for Respondent,
Pacifica Foundation Inc., a California nonprofit public benefit corporation

ARTHUR Z. SCHWARTZ
Advocates for Justice, Chartered Attorneys
225 Broadway, Suite 1902
New York, NY 10007
Tel.: 212-285-1400
Fax: 212-285-1410
Email: aschwartz@afjlaw.com

Proposed Attorneys for Respondent,
Pacifica Foundation Inc., a California nonprofit public benefit corporation

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JOHN C. VERNILE,
Petitioner,

vs.

PACIFICA FOUNDATION INC., a California Nonprofit Public Benefit Corporation,
Respondent.

---

PACIFICA FOUNDATION INC., a California Nonprofit Public Benefit Corporation,
Cross-Petitioner,

vs.

JOHN C. VERNILE,
Cross-Respondent.

Case No. 2:22-cv-02599-SVW-PVC

**PACIFICA FOUNDATION INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PETITIONER'S MOTION FOR SUMMARY JUDGMENT**

**Date**: August 22, 2022
**Time**: 1:30 PM
**Courtroom**: 10A
**Judge**: Hon. Stephen V. Wilson

# TABLE OF CONTENTS

INTRODUCTION ..... 1

ARGUMENT SUMMARY ..... 2

ARGUMENT ..... 8

- I. Petitioner Improperly Applies Federal Law to the Merits. ..... 8
- II. If Federal Law Applies the Outcome is the Same – the Award Should be Vacated. ..... 10
  - A. Federal law bars arbitrators from exceeding the scope of the Arbitration Agreement. ..... 10
  - B. Procedural unfairness or irregularity provides grounds to vacate. ..... 12
  - C. An award may be vacated if the arbitrator acts in manifest disregard for the law. ..... 12
- III. There is No Factual Dispute Regarding the Limited Scope of the Arbitration Agreement . ..... 13
  - A. Petitioner's discussion of the scope of the Arbitration Agreement is sophistry. ..... 13
  - B. Respondent did not waive the scope of the Arbitration Agreement. ..... 16
- IV. There is No Factual Dispute That the Arbitrator Exceeded the Scope of the Arbitration Agreement . ..... 17
  - A. The snippets of testimony submitted by Petitioner do not demonstrate consent to litigate of the defamation issue. ..... 17
  - B. The Award Bore No Relationship to the Testimony at the Hearing or Attached to Plaintiff's Papers—The Decision Cited Only Post-Termination Statements and Only Evidence Submitted After Testimony Closed. ..... 19
- V. There is No Factual Dispute That the Arbitrator Engaged in Misconduct By Admitting the Recordings Following the Arbitration Hearing Without Re-Opening Testimony . ..... 21
- VI. There is No Factual Dispute Regarding the Arbitrator's Violation of Pacifica's Statutory and Constitutional Rights ..... 22

CONCLUSION ..... 25

# TABLE OF AUTHORITIES

## Cases

Armandariz v. Foundation Health Psychcare Services, 24 Cal4th 83 (2000) ........ 14

AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643 (1986) ............ 10

Carte Blanche (Singapore) Pte. Ltd. v. Carte Blanche Intern., Ltd., 683 F.Supp. 945 (S.D.N.Y. 1988) .......... 12

Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Intern., Ltd., 888 F. 2d 260 (1989) .......... 13

Comedy Club, Inc. v. Improv West Associates, 553 F.3d 1277 (9th Cir. 2009) ..... 11

Delta Lines, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers, Local 85, 409 F.Supp. 873 (N.D.Calif., 1976) .......... 11, 17

Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938) .......... 8

Greenfield Advisors LLC v. Salas, 733 Fed.Appx. 364 (C.A.9 (Wash.), 2018) ...... 9

Gulf and South America Steamship Co., Inc. v. National Maritime Union of America, 360 F.2d 63 (5th Cir. 1966) .......... 11

Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657 (1989) .......... 23

Johnson v. Gruma Corp., 614 F. 3d 1062 (9th Cir. 2010) .......... 9

Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52 (1995) ............... 9, 10

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros, 70 F.3d 418 (6th Cir.1995) .......... 13

Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc., 473 U.S. 614 (1985) .......... 9

Newark Morning Ledger Co. v. Newark Typographical Union Local 103, 797 F.2d 162 (3d Cir.1986) .......... 12

Perry v. Thomas, 482 U.S. 483 (1987) .......... 10

Reader's Digest Assn. v. Superior Court, 37 Cal. 3d 244 (1984) .......... 25

Retail Store Employees Union Local 782 v. Sav-On-Groceries, 508 F. 2d 500, 502-503 (1975) .......... 11

Solvay Pharmaceuticals, Inc. v. Duramed Pharmaceuticals, Inc., 442 F.3d 471 (6th Cir.2006) .......... 11, 15

St. Amant v. Thompson, 390 U.S. 727 (1968) .......... 24

Totem Marine Tug & Barge, Inc. v. North American Towing, Inc., 607 F.2d 649 (5th Cir. 1979) .......... 11

United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593 (1960) .......... 11, 12

Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468 (1989) .......... 9, 10

Wilko v. Swan, 346 U.S. 427 (1953) .......... 13

## Statutes

9 U.S.C. § 10(a)(3) .......... 12

9 U.S.C. § 10(a)(4) .......... 11

9 U.S.C.A. § 10(d) .......... 11

## Other Authorities

G. Wilner, 1 Domke on Commercial Arbitration § 4:04 (rev. ed. Supp.1993) .......... 10

Summers, *Judicial Review of Labor Arbitration,* 2 Buffalo L.Rev. 1 (1952) .......... 12

Respondent/Cross-Petitioner Pacifica Foundation Inc. ("Pacifica"), respectfully submits this memorandum of points and authorities in opposition to Petitioner John Vernile's ("Petitioner") motion for summary judgment ("Petitioner's Motion").

**INTRODUCTION**

A quick review of the arbitration process and the arbitration Award at issue demonstrates exactly how preposterous a situation Pacifica finds itself in as Petitioner moves for summary judgment confirming the Award. Petitioner has moved for summary judgment, making an effort, in fact, to explain why Pacifica's own motion fails as a matter of law. Relying mostly on a misreading of the Arbitration Agreement, a cursory review of the (wrong) law, and 7 snippets of testimony (totally 12 minutes and 38 seconds of a 7-day, 60 hour plus hearing) Petitioner argues that the arbitration was not only the agreed upon means to address Petitioner's termination, but a proceeding properly addressed to his post-termination defamation claim.

Petitioner contends that "[t]he transcripts of the oral testimony submitted to the court…prove that the defamation of Vernile by Pacifica occurred in a continuous and unbroken outpouring of libelous and defamatory statements broadcast over the airwaves…during the period of his employment and immediately thereafter." (Pet. Motion pg. 9: 16-20.) Petitioner's argument fails for several reasons. First, the transcripts referenced by Petitioner contradict his position that the testimony "proved" his defamation claim. Sabrina Jacobs ("Jacobs") claimed there were "a lot of lies" being said about Petitioner, but did not testify as to what the defamatory statements in fact were or who made them. The testimony of Bill Crozier ("Crozier") similarly offered no insight as to the specific defamatory statements or who said them. That leaves only Petitioner's testimony to prove his defamation claim but, once again, he failed to do so. In Petitioner's oral testimony – much of which was elicited by Pacifica – he claimed that he was "suddenly a

fascist" and was "going to sell WBAI."  Again, no reference to specific statements and, Pacifica established that Petitioner's goal of selling WBAI and changing its program was in fact true.

Petitioner's own post-hearing brief further shows that it was the "audio files submitted in this matter are replete with defamatory statements about Vernile" organizing a "coup" by a "rogue group."  (Pet. Motion, Ex. H, pg. 17.)  As set forth in the Award, it was the audio recordings – not the oral testimony (which never mentioned the words coup or rogue group) – that the Arbitrator relied on when rendering her decision on the defamation claim.  Allowing Petitioner to introduce evidence after the conclusion of testimony and not giving Pacifica an opportunity to address that evidence is the crux of Pacifica's fundamental unfairness argument about the arbitration proceeding.

Second, the statements that Arbitrator Welch concluded were actionable defamation arose from a broadcast that aired on December 20, 2019, after Petitioner had already been terminated by Pacifica.  As set forth in Pacifica's Motion and addressed in greater detail below, the post-termination defamation claim falls outside of the scope of the Arbitration Agreement and the procedures adopted by Arbitrator Welch in considering the defamation claim were inherently prejudicial to Pacifica.  As such, Petitioner's motion should be denied, Pacifica's Motion should be granted and the Award should be vacated.

## ARGUMENT SUMMARY

Pacifica, an amalgam of five listener -supported, not for profit radio stations, hired Petitioner John Vernile to serve a six-month sting as its Interim Executive Director beginning August 1, 2019. Barely two months later, without approval of the Board of Directors, he fired the entire staff of Pacifica's New York City radio station, and took all local programming off the air and substituted programming from elsewhere – which he chose. The event was a major public event – the then Mayor of New York City Tweeted about the loss; the current Mayor stood on the

steps of City Hall denouncing the move; the NY Times ran an article about the "death of WBAI." His action spawned litigation by the affected staff – which was successful. It also led to Vernile's suspension by the Board,on October 20, 2019 and then his termination, a mere three months after he was hired. Animosity did run high among the staff at WBAI he had fired: about 12 full-time employees and 150 volunteer program producers.

Petitioner had signed two documents: the Draft Agreement (Corrected Ex. 32) and the Offer of Employment (Pacifica Motion, Ex. 33). Both had the following language:

> Arbitration. In the unlikely event of a dispute between Pacifica and the Employee **arising out of Employee employment or the termination of employment**: Pacifica and Employee agree to submit our dispute to final and binding arbitration with the American Arbitration Association (AAA) or similar provider. Employer and Employee will select a mutually agreeable arbitrator. The arbitration will be held in accordance with AAA's then applicable rules for the resolution of **employment disputes**, as the exclusive remedy for such controversy, claim or dispute, unless another forum or Arbitrator or Association is agreed to by both parties. A copy of the current AAA employment arbitration rules is available at https://www.adr.org/. …
> By agreeing to arbitration, Employee and Pacifica are agreeing that **there will be no court or jury trial of disputes between parties concerning Employee's employment or the termination of Employee employment.** …. In addition. Pacifica and Employee agree that Pacifica and Employee shall have the right to seek judicial relief in the form of injunctive and/or other equitable relief under the California Arbitration Act, Code of Civil Procedure section 1281.8…. (Emphasis supplied).

The day after Petitioner was fired, on November 15, 2019 he sent a letter demanding arbitration. In it he stated: "*I am **protesting my termination** as being in violation of the terms of my employment agreement and in violation of federal and California state laws. Pursuant to the terms of my employment contract I am invoking/requesting arbitration with the American Arbitration Association in the state of California.*" See Pacifica Motion, Ex. 9. Not word about a tort –

defamation or otherwise. The next day a lawyer appeared, and insisted that "California law be applied to any litigation concerning [Petitioner's] employment." See Pacifica Motion, Ex. 10. Again, not a word about "defamation" or any other tort.

Six months later his lawyer got around to filing the form which got the American Association to appoint an arbitrator. On that form he stated that his claim involved "Breach of contract," "wrongful termination" and "defamation and intentional infliction of emotional distress" based on the facts set forth in the attachment, but nowhere in his lengthy description of the claim did he discuss a defamatory statement, most certainly not one post-dating his employment. See Pacifica Motion, Ex. 12.

One year and seven months later, after discovery was completed, Petitioner filed a "Pre-Hearing Brief." (Motion, Ex. 14.) At no point in the 22-page brief did Petitioner mention the word "defamation." The closest he came was an assertion on page 15 of the Brief that "[on or about October 12, 2019] Ms. Aarons, and other persons opposing the WBAI layoffs started spreading false claims and accusations against Claimant regarding the actions taken in New York," and an assertion on page 16 that on the same date Petitioner had filed a complaint with Pacifica's Human Resources Director and its Board Chair, that he had been "subject to acts of intimidation, slander and harassment in retaliation for his attempt to fulfill his legal, contractual, fiduciary and professional obligations." There was no mention of the words "slander," "defamation" or false statements" on any date after October 12, 2019. The only damages sought were "damages he suffered from his wrongful termination ($720,000 in salary and $210,000 in benefits)," "punitive damages and attorney's fees in amounts to be established at the hearing." Not a word about damages flowing from defamation.

Petitioner then presented his case over the first 5 days of a 7-day hearing. He has submitted all of the testimony (all of 11 minutes' worth) which ***he says*** proves

his defamation claim.  (Pet. Motion pg. 9: 16-20, Ex. E.)  But only two of those snippets involved testimony during his direct case, one from a former Board member Jacobs,  who said before and after Petitioner's termination there was "a lot of slander, libel, mendacity, lot of ---just a bunch of lies;" and a second snippet from Jacobs where she said "the slander started after Grace was removed as Chair [which occurred in mid-September 2019]…it was her; it was Alex Steinberg… saying that I [not Vernile] was coming in trying to take over WBAI…just ugly, ugly…untruths, just mendacious crap…like "Oh we need to protect WBAI, blah, blah, blah…."  (Pet. Motion, Ex. E, pg. 3: 12-15, pg. 5: 17-23.)  That was it.

On rebuttal Respondent put on one witness, former National Board Secretary Crosier, who stated that the grounds for termination in the termination letter are false and expose [Pacifica to] more liability and litigation." (Pet. Motion, Ex. E, pg. 14.)

The arbitration hearing ended, and the arbitrator offered to allow either side to put in documents which hadn't been introduced during the hearing. Petitioner wanted to put in a series of 11 tape records, each from two to seven hours in length, with no testimony to acertain when they were taped, who was speaking on the recordings or in what capacity, in order to "prove defamation." Respondent vigorously objected to adding this material after the hearing had closed, with no statement of what on the tapes (which had dates through February 2021) was defamatory, and no opportunity to put on testimony about any statements being put into evidence. The arbitrator allowed the tapes in, without foundation, refursed to reopen the hearing, and gave Respondent only the opportunity, in a Rebuttal Brief, to respond.

The award itself read like an indictment of Pacifica, reciting every smarmy criticism Petitioner had at length, but then found that he was not fired because he was a whistleblower.  Notably, Arbitrator Welch found that:

> "Pacifica has met its burden of establishing by clear and convincing evidence that it terminated Vernile's employment because the PNB believed that he had exceeded his authority by discharging WBAI staff and shutting down its local programming without full PNB approval, and that further, that he exceeded his authority by not reversing that decision until ordered to do so by Justice Crane.9 Pacifica has established that it would have terminated Vernile's employment even if he had never complained about other legal violations."

Pacifica Motion, Ex. 34, pg. 32.

But the arbitrator went on to find that in a broadcast on December 19, 2019, where a tape of a November 7, 2019 rally was played, a Pacifica employee stated that Petitioner was hired to carry out a plan to sell WBAI for "millions and millions of dollars to benefit the other stations" and that he was part of a "rogue group" who had staged a "coup" and that Perry stated that the plan had been "in the works for a long time, to dump WBAI." Id. at pg. 34-35. Arbitrator Welch also found that during the December 19, 2019 broadcast "Perry also broadcast the following statements made by [WBAI volunteer Mimi] Rosenberg at the October 7, 2019 rally [the day the station was shut down]: "the name you need to know is John Vernile, a newly hired Pacifica ED who was brought on board as part of a plan to steal our station…who got a six month contract and immediately sucked the juice out of WBAI…many people want to sell [WBAI's] license towards the end of propping up their own flagging resources." Id.

The Arbitrator found that these comments were "defamation per se," (ignoring what defamation per se is, since members of the general public would have no idea what the comments made on Perry's broadcast referred to), and found that Pacifica was vicariously liable for what Perry said because she was an employee (and because the tort was 'willful and malicious,' (Ex. 34, pg. 35) a finding she did not explain), but then acknowledges that Petitioner was at least a "limited public figure," and that constitutional "actual malice" had to be proven by Petitioner. Id. at pg. 36. Arbitrator Welch had to somehow figure out how

Petitioner did that, given that there was no testimony by either side about the statements, the broadcasts, or Perry's knowledge of what occurred (although she did testify that she spent the day with Petitioner, "playing along" as though she was a supporter of the shutdown, on the day it occurred.

Nonetheless, this is how Arbitrator Welch addressed the need to prove "actual malice:"

> "Vernile has met this burden. He has shown by clear and convincing evidence that Perry, along with other supporters of WBAI, including those on the PNB, were ***colossally hostile*** towards Vernile. As just one example, when Vernile first began working at Pacifica, Aaron told him that she was 100% behind him, but that if he hurt Pacifica she "would destroy him." Apparently that was the attempt. Vernile was denounced in public and called "vermin." He was called a "rat" and a "crook" on the air. ***Although these sophomoric epitaphs do not constitute slander, as explained supra, they nonetheless reveal the maliciousness*** Vernile faced; so much so that he feared for his and his family's safety. In this highly charged and vitriolic environment, it is no wonder that Perry (and others) did not investigate claims they made on air to determine their truth or falsity. They were in an echo chamber, repeating falsehoods as received wisdom, when in fact the falsehoods were simply that."

Id. at pg. 37-38 (emphasis added).

As a coup de grace, given that the arbitrator had found the broadcast comments to be "slander per se," and having made the observation that,

> "[w]hat broadcaster would want to hire someone who had acted as a 'rogue' and staged a 'coup?' Who would want to hire someone who surreptitiously sought to sell off a station's assets? Or who told the station's landlady to find a new tenant, potentially leaving the station without a home from which to air programming?"

Id. at pg. 38.   Interestingly, Arbitrator Welch made this determination without asking what broadcaster would want to hire someone who took a station off the air, fired all of its employees, and did so without having been given authority by the

board, and without requiring Petitioner to prove his defamation damages of $300,000.

## ARGUMENT

### I.  Petitioner Improperly Applies Federal Law to the Merits.

Even though the Petition does not invoke the jurisdiction of this Court under 28 USC Section 1332 (it asserts jurisdiction under 28 USC Sections 1331 and 1338), Petitioner's Motion, at page 1, now asserts that this is a diversity case, governed by Erie Railroad Co. v Tompkins, 304 U.S. 64 (1938). Then he asserts that Federal Law (notably the Federal Arbitration Act) must be applied to this case. But in Erie, the Supreme Court stated:

> "Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern. There is no federal general common law. Congress has no power to declare substantive rules of common law applicable in a state whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts. And no clause in the Constitution purports to confer such a power upon the federal courts."

Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).

Of course, here, the case not only involved a contract with a California Corporation, but the arbitration agreement stated in the Draft Agreement (Corrected Ex. 2) stated (at Paragraph 13(h) that; "This agreement shall be governed by, construed and enforced in accordance with the laws of the State of California, " Additionally, both the "Draft Agreement" (Corrected Ex. 2) and the Offer Letter (Ex. 3) stated that "Pacifica and Employee  shall have the right to seek judicial relief …under the California Arbitration Act." And Petitioner's own lawyer, in his first communication to Pacifica (Ex. 11) states that "Mr. Vernile's employment contract specifies that not only is California Law is to be applied, but that any litigation concerning his employment is to occur in California." That same lawyer signed the brief which now asserts that Federal Law applies.

Petitioner then asserts that the Supreme Court, in Mastrobuono v Shearson Lehman Hutton, Inc. held that in cases "involving interstate commerce…even when the arbitration contract cites state law, the FAA preempts state arbitration law." But that is not what Mastrobuono (which never used the word "preempts") stands for. The Court stated:

> "We have previously held that the FAA's proarbitration policy does not operate without regard to the wishes of the contracting parties. In Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468 (1989), the California Court of Appeal had construed a contractual provision to mean that the parties intended the California rules of arbitration, rather than the FAA's rules, to govern the resolution of their dispute. Id., at 472. Noting that the California rules were "manifestly designed to encourage resort to the arbitral process," id., at 476, and that they "generally foster[ed] the federal policy favoring arbitration," *id.,* at 476, n. 5, we concluded that such an interpretation was entirely consistent with the federal policy "to ensure the enforceability, according to their terms, of private agreements to arbitrate," id., at 476. After referring to the holdings in Southland and Perry, which struck down state laws limiting agreed-upon arbitrability, we added:
>
> 'But it does not follow that the FAA prevents the enforcement of agreements to arbitrate under different rules than those set forth in the Act itself. Indeed, such a result would be quite inimical to the FAA's primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms. Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, see Mitsubishi [Motors Corp. v. Soler Chrysler–Plymouth, Inc., 473 U.S. 614, 628 (1985)], so too may they specify by contract the rules under which that arbitration will be conducted." Volt, 489 U.S., at 479.'"

Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 57 (1995); see also Johnson v. Gruma Corp., 614 F. 3d 1062, 1067 (9th Cir. 2010) (holding that "[w]here state arbitration rules control arbitration proceedings, [the reviewing court] must apply the state vacatur standard."). Greenfield Advisors LLC v. Salas, 733

Fed.Appx. 364, 367 (9th Cir. 2018) ("The parties' arbitration clause, which is written broadly to encompass Washington law in nearly all respects, evidences a clear intent to incorporate Washington state law rules for arbitration.").

The California law cited in Pacifica's Motion is the proper law to apply. Notably, in both employment documents signed by Petitioner, the Parties also agreed that the California Courts would have "exclusive" jurisdiction over an action to enforce any right or obligation under this agreement." Pacifica had moved to dismiss on this ground, but withdrew that motion in order to streamline the resolution of this case utilizing this cross motion for summary judgment procedure. It would be absurd, however, for Petitioner to argue that the parties agreed to give the California Courts exclusive jurisdiction, but not to have made a California choice of law.

## II. If Federal Law Applies the Outcome is the Same – the Award Should be Vacated.

Even if this Court were to apply Federal Law, the Respondent's Counter-Petition to vacate should be granted, because in all substantive respects, Federal Law and California Law are largely similar.

### A. Federal law bars arbitrators from exceeding the scope of the Arbitration Agreement.

Notwithstanding the "liberal policy" favoring arbitration, agreeing to arbitrate "is a matter of contract[,] and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986).

When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally…should apply ordinary state-law principles that govern the formation of contracts. See, e.g., Mastrobuono, supra, at 62–63, and n. 9,; Volt Information Sciences, *Inc.,* 489 U.S. 468, 475–476 (1989); Perry v. Thomas, 482 U.S. 483, 492–493, n. 9 (1987); G. Wilner, 1 Domke

on Commercial Arbitration § 4:04, p. 15 (rev. ed. Supp.1993)  Only disputes "that the parties have agreed to submit to arbitration" should be arbitrated. *Id.* at 943. Comedy Club, Inc. v. Improv West Associates, 553 F. 3d 1277, 1284–85 (9th Cir. 2009).

In determining whether a contract provision implicates arbitrability, courts will look to the intent of the parties in various ways.  Solvay Pharmaceuticals, Inc. v. Duramed Pharmaceuticals, Inc., 442 F. 3d 471, 478 (6th Cir. 2006).   For example, courts may consider "the location of the targeted provision—*i.e.,* the limitation that the arbitrators allegedly violated—in the contract."   Id. "If the limitation appears in close proximity to the arbitration clause, there is good reason to believe that the parties considered it to be a limitation on the proper subjects for arbitration."  Id.

Similarly, arbitrators derive their authority from the scope of the contractual agreement. United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 597 (1960); Gulf and South America Steamship Co., Inc. v. National Maritime Union of America, 360 F. 2d 63, 65 (5th Cir. 1966). The award of an arbitration panel may be vacated where the arbitrators exceed their powers. 9 U.S.C. § 10(d); Retail Store Employees Union Local 782 v. Sav-On-Groceries, 508 F. 2d 500, 502-503 (1975); Delta Lines, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers, Local 85, 409 F.Supp. 873, 876 (N.D. Cal. 1976); Totem Marine Tug & Barge, Inc. v. North American Towing, Inc., 607 F. 2d 649, 651 (5th Cir. 1979)

It is well settled that "[c]ourts may vacate arbitration awards 'where the arbitrators exceed[] their powers,' 9 U.S.C. § 10(a)(4), the idea being that periodic judicial intervention promotes arbitration in the long run" as "[m]ore parties will contract for arbitration if they can tailor arbitration to their particular needs; and fewer will opt for arbitration if they cannot." Solvay Pharmaceuticals, Inc., 442 F. 3d at 475.

/ / /

As the Supreme Court has guided, an arbitrator's award is legitimate if it draws its essence from the arbitration agreement and an award "fails to draw its essence from the agreement when: it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on 'general considerations of fairness and equity' instead of the exact terms of the agreement. Id. at 476 (citing Beacon Journal Publ. Co. v. Akron Newspaper Guild, Local No. 7, 114 F. 3d 596, 599 (6th Cir. 1997); see also United Steelworkers of Am. v. Enter. Wheel & Car Co., 363 U.S. 593, 597 (1960).

**B. Procedural unfairness or irregularity provides grounds to vacate.**

Although the FAA requires restraint in reviewing arbitration awards, it does not call for total abdication of reviewing power. See Newark Morning Ledger Co. v. Newark Typographical Union Local 103, 797 F. 2d 162, 165–66 n. 3 (3d Cir.1986) (quoting Summers, *Judicial Review of Labor Arbitration,* 2 Buffalo L.Rev. 1, 21–22, 24 (1952)). The FAA provides grounds to vacate an arbitration award where an arbitrator is guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced. 9 U.S.C. § 10(a)(3). Thus, a district court may consider procedural irregularities insofar as they rise to the level of requiring vacatur or modification of the award pursuant to sections 10 and 11 of the FAA. Carte Blanche (Singapore) Pte. Ltd. v. Carte Blanche Intern., Ltd., 683 F.Supp. 945, 956 (S.D.N.Y. 1988). To hold otherwise would not serve the purposes of the FAA. Id.

**C. An award may be vacated if the arbitrator acts in manifest disregard for the law.**

As an alternative to these statutory grounds, a separate judicially created basis for vacation exists where the arbitration award was made "in manifest disregard of

the law." Wilko v. Swan, 346 U.S. 427 (1953). Although the parties have bargained for a resolution by way of arbitration, a blatant disregard of the applicable rule of law will not be tolerated. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros, 70 F. 3d 418, 421 (6th Cir.1995) As the court in Merrill Lynch stated:

> "Manifest disregard of the law" by arbitrators is a judicially-created ground for vacating their arbitration award….It is not to be found in the federal arbitration law. Although the bounds of this ground have never been defined, it clearly means more than error or misunderstanding with respect to the law. The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator. Moreover, the term "disregard" implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it.

Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Intern., Ltd., 888 F. 2d 260, 265 (1989) (citing Merrill Lynch, 70 F. 3d 418, 421 (6th Cir.1995).

As the above holdings demonstrate, Federal arbitration law is largely the same as the California law discussed by Respondent it its Memorandum supporting its Summary Judgment Law. In California "manifest disregard of the law" is seen as an Arbitrator acting in excess of his/her authority. Generally, the discussion of the facts below demonstrates that under either California or Federal Law, the Motion to Confirm has holes, and the Counter Motion to Vacate is soundly reliant on the facts and the law.

## III. There Is No Factual Dispute Regarding the Limited Scope of the Arbitration Agreement.

### A. Petitioner's Discussion of the Scope of the Arbitration Agreement is Sophistry.

The scope of the arbitration agreement is discussed in two different phrases in what both sides agree was Petitioner's simultaneous contracts. In one paragraph it is described as "**a dispute between Pacifica and the Employee arising out of Employee employment or the termination of employment**," and several sentences later it is described as "**disputes between parties concerning**

**Employee's employment or the termination of Employee employment."** The agreement also refers to arbitrating pursuant to the American Arbitration Association's employment rules.

Contrary to Petitioner's assertion, Arbitrator Welch never discussed the scope of her authority, nor how the defamation claim was a "dispute concerning Employee's employment of the termination of his employment." Without any testimony of any sort, at the hearing or as part of the record in the cross-motions, Petitioner asserts that the Petitioner's contracts were "quasi-contracts of adhesion." Petitioner's Memo then goes on to say that "The transcripts of the oral testimony submitted to the court as Exhibit F to the declaration of Stephen Jaffe prove that the defamation of Petitioner by Pacifica occurred in a continuous and unbroken outpouring of libelous and defamatory statements broadcast over the airwaves of WBAI-FM to the entire New York metropolitan area during the period of his employment and immediately thereafter." (Pet. Motion pg. 9: 16-20.)

As discussed below, Exhibit F shows no such thing and there was no such finding by Arbitrator Welch. Moreover, WBAI was off the air during the last five weeks of Petitioner's employment. Regardless, this assertion has nothing to do with the scope of the agreed upon arbitration clause. In anticipation that Pacifica would argue that the purported defamation occurred ***after*** Petitioner's termination, and therefore is not subject to the Arbitration Agreement, Petitioner answers as follows:

> "The defamation constitutes a single, inseparable and continuous course of activity by Pacifica, clearly arising out 'out of Employee employment or termination of employment' on of obtaining employment. Not only is such a contract presumptively one-sided in favor of its author (Pacifica), it is to be strongly construed against its writer."

(Id. at pg. 9: 21-25 (citing Armandariz v Foundation Health Psychcare Services, 24 Cal. 4th 83 (2000)).)

Petitioner's argument in no way addresses the scope of the Parties' Arbitration Agreement and the holding in Armandariz, which addresses

unconscionable waivers of rights in employment contracts, is inapplicable to the facts of this case as there is nothing unconscionable about the Arbitration Agreement. To be arbitrable, Petitioner's claims must "concern his employment or the termination of that employment." The Arbitration Agreement certainly did not provide for the arbitrability of separate tort claims which arose after his employment ended – which is exactly what Arbitrator Welch considered. ***Arbitrator Welch's award clearly arises from a broadcast on December 20, 2019.*** During the December 20, 2019 broadcast, statements from a rally on October 7, 2019 by a station supporter and statements made on November 7, 2019, the day Judge Crane ordered the station back on the air, were aired.

Petitioner has an answer for that too, arguing that:

> "[t]he termination of employment is not a micro-second in time. It is a continuous course of action by an employer occurring before, during and after the actual separation of the employee. Employers can adversely affect past employees in many ways – by withholding wages, refusing to provide honest references…and indeed, by defaming their former employee."

(Pet. Motion, pg. 10: 9-13.) According to Petitioner, he can force Pacifica to arbitrate a purported defamatory statement made by a Pacifica employee ***today***. This assertion finds no basis in the plain reading of the contract language. "(1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement." Solvay Pharmaceuticals, Inc. v. Duramed Pharmaceuticals, Inc., 442 F. 3d 471, 475 (6th Cir.2006). Tellingly, the clause requires use of the American Arbitration Associations Employment Rules – in this case it was invocable just as Petitioner did in his arbitration demand, (Pacifica Motion, Ex. 10), on November 15, 2019, to wit, "I am protesting my termination."

/ / /

No reading of the arbitration clause, even the bizarre, baseless explanation given by Petitioner about a continuous course of defamatory conduct, extends its coverage to that December 20, 2019 broadcast, and the findings growing out of that broadcast made by Arbitrator Welch.

**B. Respondent Did Not Waive the Scope of the Arbitration Agreement.**

Petitioner makes two arguments about how Respondent waived any dispute about the arbitrability of the "defamation" issue. He asserts that the May 27, 2020 Request to the American Arbitration Association that it appoint an arbitrator, which was filed 7 months after the initial arbitration demand, had the word defamation in it. (Pet. Motion pg. 13: 5-9.) But the factual explanation attached, which detailed the arbitration issues, did not discuss a single defamation allegation other than to say: "Respondent and its agents and authorized representatives also defamed Claimant in statements made in writing and orally, including in radio broadcasts." (Pacifica Motion, Ex. 11.) But it would have been premature to object to a potential defamation claim based on the minimal information provided in Petitioner's arbitration demand submitted to the AAA. Stated differently, Pacifica could not have waived a claim or defense, as Petitioner contends, without first knowing what it was. See, e.g., Fed. R. Civ. P. 8(a).

Moreover, Petitioner said nothing about defamation in his pre-hearing brief submitted a year and a half later. (Pacifica Motion, Ex. 14.) Then, in his 5-day long direct case, there was no presentation about a defamatory statement, much less one pre-discharge. When Pacifica asked one question of Petitioner during Pacifica's defense, Arbitrator Welch even asked whether "defamation" was still part of the case, since counsel for Petitioner had said that "intentional infliction of emotional distress" was waived. Counsel responded: "I think the same [meaning waiver]---well, there has been some evidence that has come in on defamation, I think we

should leave that in for now." But then he never came back to it. Thus, if there was any waiver here, it was Petitioner waiving his defamation claim(s).

Furthermore, there is no question that once Petitioner tried to litigate the post-termination defamation issue through the post-hearing introduction of post-termination tape recordings, Pacifica vigorously objected, both on due process grounds, and because any such claim had been waived. But when the arbitrator rules that she was allowing the tapes in and refusing to reopen testimony, Pacifica was limited to discussing defamation in its Rebuttal Brief. (Pacifica Motion, Ex. 31.)

Finally, none of Pacifica's actions during the arbitration had the effect of expanding the scope of the Arbitration Agreement.

> "[I]f the Court finds that the alleged violations were beyond the contemplation of the submission, the arbitrator certainly had no authority to hear them. For the same reason, defendant's contention that the plaintiff *impliedly recognized* the arbitrator's 'authority' is not helpful. Nor is it accurate. The attorney representing Delta at the hearing before Arbitrator Myers made clear his position that the only issue to be arbitrated was whether Weaver was discharged for just cause. This Court will not say that plaintiff 'recognized' the arbitrator's authority merely because it chose to contest the procedural propriety of arbitrating the alleged violations, and then took the added precaution of arguing those issues on the merits once it appeared the arbitrator had decided to include them in his consideration.

Delta Lines, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers, Local 85, 409 F.Supp. 873, 875–76 (N.D. Cal. 1976). There was no waiver in the proceeding of the limitations of the arbitration clause

## IV. There Is No Factual Dispute That the Arbitrator Exceeded the Scope of the Arbitration Agreement.

### A. The snippets of testimony submitted by Petitioner do not demonstrate consent to litigate of the defamation issue.

Petitioner's effort to demonstrate that there is no issue of fact that the 7 days of the arbitration hearing (about 55 hours of testimony) addressed the defamation issue, Petitioner's counsel, who was not present at the hearing, presents 7 snippets

of testimony, encompassing, in total, 12 minutes and 38 seconds, to make his point. (Pet. Motion, Ex. E.)

Only two of the snippets are from testimony during Petitioner's direct case, and both are excerpts from the testimony of Jacobs, who was Acting Chair of Pacifica when Petitioner appeared in New York City with Crosier, threw the staff out of the WBAI studio, fired everyone, and took the local feed for the station off the air. Jacobs and Petitioner were the top officers of Pacifica until Petitioner was suspended on October 20, 2022 (she stopped attending Board Meetings). Her testimony was extremely general; she testifies that in "the last quarter of 2019, beginning the first quarter of 2020…there were still a lot of things being thrown at him …a lot of slander, libel, mendacity…just a bunch of lies a lot of lies…before and after" Petitioner was terminated as Pacifica's Executive Director. (Pet. Motion, Ex. E, pg. 3: 8-9, 12-15, 20.)

Then she speaks about when the "slander started." She pins it to the period "after Grace was removed as Chair [of Pacifica and replaced by Jacobs, which was in mid-September 2019]." (Id. at pg. 5: 8-9.) But when this occurred, as we stated, Petitioner and Jacobs were running Pacifica, so if someone was slandering Petitioner during that time it was on their own watch and Pacifica has no responsibility.

The next four snippets were from Day 6, when Pacifica called Petitioner as its own witness, and Petitioner's attorney cross examined him. Again, he spoke about a period when he, Jacobs and Crosier were running Pacifica. He testifies that at some unstated date, before the "layoffs" (which means before October 7, 2019) some unnamed person called him a "fascist," a "racist," and said he was "going to sell BAI." (Id. at pg. 7: 8-13.) Petitioner later testified "I still get attacked over these issues…there's still people…that are claiming that I tried to kill BAI." (Id. at pg. 10: 13-16.) Importantly, however, this testimony does not tie who makes those claims to Pacifica in any way. Then Petitioner testified: "Once they went back on

the air with local programming it was like…'Attack Vernile Fest.'" (Id. at pg. 11: 24-25, pg. 12: 1-3.)

Petitioner's attorney decided not to elicit any more specific testimony from Petitioner deciding not to "bring it up now." (Id. at pg. 12: 7-8.) No particular statements, or the identity of the speakers were discussed. And again, critically, this was on Petitioner's rebuttal case, not his direct case. There was another general reference to someone calling Petitioner a "racist" but, again, no further specifics were provided. (Id. at pg. 13: 25, pg. 14: 1.) None of this testimony – most of which involved unnamed individuals attacking him while he and Jacobs were in charge of Pacifica, addressed a claim against Pacifica, a corporation, for defamation. And none of this material made its way into the Award, because the Award was addressed to defamation which the arbitrator said she heard on the recordings admitted post-testimony – all of which were aired in December 2019, a month after Petitioner was terminated, and a month after he made his arbitration demand.

**B. The Award Bore No Relationship to the Testimony at the Hearing or Attached to Plaintiff's Papers—The Decision Cited Only Post-Termination Statements and Only Evidence Submitted After Testimony Closed.**

In assessing whether the Arbitrator exceeded her authority, one critical component involves what specific issues the Arbitrator decided. Petitioner asserts that Arbitrator Welch's ruling drew its essence from six snippets of testimony which he attaches as Exhibit E to the Jaffee Declaration. But, Petitioner's actual reference to the record was limited to one paragraph in his post-arbitration brief. (Pet. Motion, Ex. H pg. 17.) In that paragraph Petitioner stated:

- "[Petitioner] frequently heard defamatory statements about him on the air at WBAI," citing the **sixth** day of testimony, January 12, at the 8 hours 16 minutes point). Id. No actual statement was cited.
- "Many of these statements attributed false motives to him regarding the layoffs at WBAI," citing the **sixth** day of testimony at the 6 hours 12 minutes point. Id. Again, no actual statement was cited.

- "They frequently accused him of attempting to sell the station, an action that he continually opposed, and he was accused of racist intent," citing the **sixth** day of testimony at the 6 hours 34 minutes and 7 hours 35 minutes points. Id.
- "On at least one occasion he was labeled a 'rat,' an often used antisemitic epithet," citing the **sixth** day of testimony at the 8 hours 7 minutes and 8 hours 25 minutes points). Id.

As discussed throughout, it is important to note that Petitioner rested his direct case during the fifth (5th) day of testimony.

Arbitrator Welch, in making her ruling, made ***no reference*** to the snippets of testimony referred to in Petitioner's post-arbitration brief or evidence produced on Days 6 and 7 of the hearing, either during Pacifica's case or in Petitioner's rebuttal. Instead, the sole focus in the Award was Arbitrator Welch's discussion about the contents of a December 20, 2019 broadcast on WBAI. Arbitrator Welch found the following defamatory:

- A December 20, 2019 broadcast on WBAI (no speaker identified), where someone stated that "Vernile was hired to carry out a plan to sell WBAI for 'millions and millions of dollars to benefit other stations' and that he was part of a 'rogue group' who has staged a 'coup'." (Pet. Motion, Ex. I, pg. 34.)
- A November 7 statement from Linda Perry (an employee) played during the December 20, 2019 broadcast "that the plan had been in the works for a long time, to drop WBAI." (Id. at pg. 34-35.
- A broadcast done by Linda Perry (no date cited) of a statement made by Mimi Rosenberg at a rally on October 7, 2019 that Vernile "was brought on board as part of a plan to steal our station…who got a six-month contract and immediately sucked the juice out of WBAI." (Id. at pg. 35.)

These three statements, all submitted through the audio recordings introduced after his testimony had closed, and from recording of a broadcast from ***December 20, 2019***, caused Petitioner $300,000 in damages.

Besides the fact that none of this was include in the arbitration demand of November 15, 2019 (Pacifica Motion, Ex. 10), or in his description of his claim to the American Arbitration Association on May 27, 2020 (Pacifica Motion, Ex. 11),

or included in Petitioner's pre-arbitration brief (Pacifica Motion, Ex. 14), none of these three "defamatory per se" statements were produced while the hearing was underway, denying Pacifica the right to examine and rebut the arbitrator's finding that the contents were untrue, much less that they were made with "actual malice."

### V. There Is No Factual Dispute That the Arbitrator Engaged in Misconduct By Admitting the Recordings Following the Arbitration Hearing Without Re-Opening Testimony.

Even though the Arbitrator's misconduct was a major focus of the Cross-Petition and Pacifica's own Motion, Respondent does not discuss them in his motion for summary judgment, except to assert that Pacifica's objections to the process in the emails he attached as Exhibit J were procedural and not an expression of a belief that the arbitrator was going beyond the bounds of the Arbitration Agreement (which we discuss in Sections III and IV above).

Exhibit J, however, demonstrates an ignored, fundamental due process objection: that the arbitrator was allowing in hours and hours of recordings without foundational testimony or an opportunity to respond. The last sentence of Pacifica's February 1st objection e-mail reads: "The claim was waived, and if the arbitrator is going to permit the litigation of the issue now without reopening the hearing, with a preliminary list of what the defamatory statements are, we will seek to stay any further proceeding on the grounds that you have engaged in prejudicial misconduct." Arbitrator's only response was to allow rebuttal briefs. In counsel's February 1st follow-up e-mail, he again demanded a second round of arbitration over "who made the statement, the responsibility of Pacifica for the statement, and the truthfulness of the statement…if Pacifica had been put on notice before the close of the hearing about these claims we would have put on relevant defenses, even if all [Petitioner] did was throw the recordings into evidence as proof." See Pet. Motion, Ex. J.

/ / /

This procedural claim made in the Cross-Petition was not addressed in Petitioner's Motion, and on this ground alone, the Court must deny Petitioner's Motion and grant the motion for summary judgment filed by Pacifica.

## VI. <u>There Is No Factual Dispute Regarding the Arbitrator's Violation of Pacifica's Statutory and Constitutional Rights.</u>

In the Cross-Petition, Pacifica also argues that the arbitrator exceeded her power by violating Pacifica's free speech right. Those arguments, also presented in Pacifica's own Motion, will not be repeated here except in one critical respect. The arbitrator accepted Pacifica's assertion that Petitioner was a public figure., although she called him a "limited public figure." (Pacifica Motion, Ex. 34, pg. 37.) Arbitrator Welch specifically found that "[t]he WBAI shutdown and Vernile's role in it became a matter of vigorous public debate in the New York region, and became a national story through the publication of articles in publications like the *New York Times*." <u>Id.</u> As such she required proof of "actual malice." Federally protected First Amendment rights come into play here.

The arbitrator said that Petitioner carried his burden because there was evidence that various individuals were hostile and bore Petitioner ill-will:

> "Vernile has met this burden. He has shown by clear and convincing evidence that Perry, along with other supporters of WBAI, including those on the PNB, were **colossally hostile** towards Vernile. As just one example, when Vernile first began working at Pacifica, Aaron told him that she was 100% behind him, but that if he hurt Pacifica she "would destroy him." Apparently that was the attempt.
>
> Vernile was denounced in public and called "vermin." He was called a "rat" and a "crook" on the air. **Although these sophomoric epitaphs do not constitute slander, as explained *supra*, they nonetheless reveal the maliciousness** Vernile faced; so much so that he feared for his and his family's safety. In this highly charged and vitriolic environment, **it is no wonder that Perry** (and others) did not investigate claims they made on air to determine their truth or falsity. They were in an echo chamber, repeating falsehoods as received wisdom, when in fact the falsehoods were simply that."

Id. at 37-38.

The U.S. Supreme Court has made it clear that under the First Amendment this is not enough:

> "It also is worth emphasizing that the actual malice standard is not satisfied merely through a showing of ill will or "malice" in the ordinary sense of the term. Indeed, just last Term we unanimously held that a public figure "may not recover for the tort of intentional infliction of emotional distress…without showing…that the publication contains a false statement of fact which was made…with knowledge that the statement was false or with reckless disregard as to whether or not it was true." Nor can the fact that the defendant published the defamatory material in order to increase its profits suffice to prove actual malice. The allegedly defamatory statements at issue in the *New York Times* case were themselves published as part of a paid advertisement. If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels. Actual malice, instead, requires at a minimum that the statements were made with a reckless disregard for the truth. And although the concept of "reckless disregard" "cannot be fully encompassed in one infallible definition," we have made clear that the defendant must have made the false publication with a "high degree of awareness of ... probable falsity,", or must have "entertained serious doubts as to the truth of his publication."

Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 666–67 (1989) (internal citations omitted).

And in the very case that the arbitrator cites, the California Supreme Court **did not** bless Arbitrator Welch's cursory approach to "actual malice":

> "As we noted earlier, the *New York Times* decision superimposed a constitutional standard on the common law of libel. If the person defamed is a public figure, he cannot recover unless he proves, by clear and convincing evidence, that the libelous statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." That decision did not define the phrase 'reckless disregard,' and its use of the term—'actual malice'—which had a different meaning in the common law of libel, engendered some confusion.

Four years later, in *St. Amant v. Thompson, supra*, 390 U.S. 727, the high court sought to clarify the constitutional standard. First, it explained, 'reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.'

The quoted language establishes a subjective test, under which the defendant's actual belief concerning the truthfulness of the publication is the crucial issue. This test directs attention to the 'defendant's attitude toward the truth or falsity of the material published…[not] the defendant's attitude toward the plaintiff.'

Although the ultimate issue is thus the good faith of the publisher, the court explained that a defendant cannot 'automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.'

As *St. Amant*'s examples suggest, actual malice can be proved by circumstantial evidence. '[E]vidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity.'

A failure to investigate, anger and hostility toward the plaintiff, reliance upon sources known to be unreliable, or known to be biased against the plaintiff – such factors may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication.

We emphasize that such evidence is relevant only to the extent that it reflects on the subjective attitude of the publisher. The failure to conduct a thorough and objective investigation, standing alone, does not prove actual malice, nor even necessarily raise a triable issue of

> fact on that controversy. Similarly, mere proof of ill will on the part of the publisher may likewise be insufficient.
>
> Upon examining the record before us, we find no triable issue as to actual malice. There is no direct evidence that MacDonald or other Reader's Digest personnel believed the questioned passages in the article were false, or even entertained serious doubts respecting their truth….
>
> Neither is there a duty to write an objective account. A publisher is 'not required to provide an objective picture or an accurate one. So long as he has no serious doubts concerning its truth, he can present but one side of the story.'

Reader's Digest Assn. v. Superior Court, 37 Cal. 3d 244, 256–59 (1984) (internal citations omitted).

Here, Arbitrator Welch made no finding about Linda Perry's beliefs or investigation because neither Perry nor anyone else ever testified about why beliefs about Petitioner's motives and goals were shared by so many people. Nor does she discuss how the fact that Petitioner fired all of the personnel at WBAI and took its programming off the air fed to beliefs about a Petitioner's nefarious motive. Her finding in this regard was, as a matter of law, in manifest disregard for the law.

**CONCLUSION**

For the above reason, and upon the reasons stated in Pacifica's Motion for Summary Judgment, the Award, to the extent that it awards $300,000 in damages for defamation to Plaintiff, should be vacated.

Dated: August 1, 2022

___Arthur Z. Schwartz________

ARTHUR Z. SCHWARTZ
Advocates for Justice, Chartered Attorneys
Attorneys for Defendant, *Pro Hac Vice*
225 Broadway, Suite 1902
New York, NY 10007
Tel.: 212-285-1400
Fax: 212-285-1410
aschwartz@afjlaw.com

Dated: August 15, 2022

**FOR PURPOSE LAW GROUP**

By: /s/ Matthew B. Learned
Matthew B. Learned, Esq.
Attorney for Respondent,
Pacifica Foundation Inc.